941 P.2d 300

**Irwin K. KELIIPULEOLE,**
**Plaintiff–Appellant,**

v.

**Michael D. WILSON, in his capacity as Chairperson, Board of Land and Natural Resources; Christopher J. Yuen, Herbert K. Apaka, Jr., Colbert Matsumoto, Michael H. Nekoba, William Kennison, in their capacities as members of the Board of Land and Natural Resources, Defendants–Appellees.**

No. 18681.

Supreme Court of Hawai'i.

June 10, 1997.

Arnold L. Lum, Native Hawaiian Legal Corporation, on the briefs, Honolulu, for plaintiff-appellant.

Sonia Faust and Linnel T. Nishioka, Deputy Attorneys General, on the briefs, Honolulu, for defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Plaintiff-appellant Irwin K. Keliipuleole (Appellant) appeals from the order and judgment granting the cross-motion for summary judgment of defendants-appellees Michael D. Wilson, in his capacity as Chairperson, Board of Land and Natural Resources (BLNR), Christopher J. Yuen, Herbert K. Apaka, Jr., Colbert Matsumoto, Michael H. Nekoba, and William Kennison, in their capacity as members of the BLNR (collectively Appellees), and the order denying Appellant's motion for summary judgment. Appellant disagrees with the land valuation method used by the BLNR to assess the value of lots subject to 999–year homestead leases. Inasmuch as the language of the statute itself, its legislative history, subsequent legislative activity, and the deference accorded administrative rulings support the position of Appellees, we affirm the order and judgment of the circuit court.

## I. BACKGROUND

This case arises from Appellant's attempt to. purchase, for the sum of $1.00, the fee simple interest in the land he leases from the BLNR. He argues that, pursuant to HRS § 171–99(a) (1993),[1] the purchase price of his

fee patent must take into account the remaining term of his homestead lease.

In 1895, the territorial legislature passed the Land Act, which permitted citizens of the Republic of Hawai'i, who did not own land classed as wet land, to apply for a 999–year homestead lease. Qualified applicants received a Certificate of Occupation, which entitled them to enter the land, build a home, and plant crops. At the end of six years, a homesteader who had met all the requirements of the act received a 999–year lease, which entitled him or her to live on the land rent-free, but required that he or she pay real property taxes. Additionally, unlike residential leaseholds, a homestead lease could not and still cannot be mortgaged, sold, or transferred except as provided in HRS § 171–99(e).

On May 11, 1912, Ms. Haui Naeole, Appellant's great-great grandmother, received Homestead Lease No. 17 to a 1.06 acre parcel,[2] known as Lot 10, in Palolo Valley. Appellant and his family have lived on the parcel since 1912. It is currently zoned residential.

In 1949, the legislature passed Joint Resolution 12 (JR 12), which, subject to ratification by Congress, repealed the homestead law, thereby bringing an end to the issuance of 999–year leases, and also authorized the sale of fee patents to existing homesteaders. In 1950, Congress ratified JR 12, which provided in relevant part that:

> Section 1. A fee simple patent shall be issued to every lessee under a 999 year homestead lease of public lands where such lands have been improved under such lease and have been occupied as a place of residence by the lessee for a period of not less than ten years, upon the payment to the commissioner of public lands of a *fair price*, disregarding the value of the improvements made by the lessee, which price shall be determined, by three disinterested citizens to be appointed by the governor.

---

1. The statute is laid out in section III.B., *infra*.

2. The original lease stated that the parcel consisted of 1.06 acres while modern surveying techniques calculate the area to be 1.08 acres.

(Emphasis added.) In 1962, subsection 93(a) of the Session Laws changed the valuation guidelines from "fair price" to "fair market price" and required that the value of the fee be determined by appraisal.

In 1988, the probate court declared Appellant to be the sole successor in interest to Homestead Lease No. 17. In 1992, Appellant applied to purchase the fee. The BLNR approved his request and contracted an appraiser to determine the fair market value of Lot 10, which he determined to be $365,000.00. This amount was later reduced to $300,000.00.

Appellant contacted both the BLNR and the Department of Land and Natural Resources (DLNR), requesting an explanation of the methods used to determine the fair market price of Lot 10. In a joint response, the BLNR and DLNR stated, *inter alia,* that:

> An independent appraiser was hired to determine the fair market value of Lot 10. In the opinion of the Attorney General's Office[,] "fair market price" should be based upon the value of the fee simple estate unencumbered by the leasehold estate.

It has been the consistent policy of the DLNR to instruct BLNR appraisers to value the fee as if it were not subject to the 999–year lease.

On November 3, 1993, Appellant filed a complaint for declaratory judgment and injunctive relief against the BLNR, arguing that HRS § 171–99(a), which establishes the guidelines appraisers must follow to determine the fair market price of land, does not allow the BLNR "to instruct its appraisers to disregard the effect on value of the encumbrance of the remaining term of a . . . homestead lease." Appellant subsequently filed a motion for summary judgment and the BLNR followed suit, filing a cross-motion. On October 19, 1994, the circuit court issued a minute order denying Appellant's motion and granting that of the BLNR. Final orders were filed on December 23, 1994 and judgment was entered on the same date. Thereafter, Appellant filed this timely appeal.

On appeal, Appellant cites the following conclusions of law (COLs) as error:

> [T]he Court believes that a ruling for State Defendants and not Plaintiff is appropriate and just for the following reasons: First, the Board is charged with the responsibility of administration of these homestead leases. There are certain "contingent interests" under section 171–99(E), relating to descent and succession, to whom the Board bears fiduciary duties. A sale would cut off those interests, and an appraisal giving Plaintiff full credit for interests that he cannot represent would constitute a breach of fiduciary duties on the part of the Board. Essentially, Plaintiff is not entitled to credit for the full balance of the 999 year term. . . . At best he may seek a determination based upon his remaining life expectancy. Second, the Board's policy is not inconsistent with the general intent and purposes of the Homestead Lease legislation. Third, the homestead lease is unique and does not have the incidents and characteristics of usual residential leases. Essentially, it is inalienable. It is not subject to mortgage. It generally requires a certiciate [sic] of occupancy, and passes restrictively in accordance with statutory descent. Fourth, the Board's policy has existed and been implemented for decades. In that time frame, the Legislature has not acted to overturn that policy. Fifth, courts are required to give deference and uphold discretionary decisions of administrative agencies. The discretionary actions of the latter are presumptively valid. Plaintiff has not overcome that presumption. Sixth, matters of public policy are for the Legislature to decide when one is unable to discern a legislative intent either from the language of the statute or its history.

## II. *STANDARDS OF REVIEW*

■ An order granting summary judgment is reviewed *de novo,* using the same standard as that applied by the trial court: whether there were any genuine issues of material facts and whether the movant was entitled to judgment as a matter of law. *State ex rel. Bronster v. United States Steel*

*Corp.*, 82 Hawai'i 32, 39, 919 P.2d 294, 301 (1996). Conclusions of law (COLs) are not binding upon an appellate court and are reviewed *de novo* under the "right/wrong" standard. *State v. Tuipuapua*, 83 Hawai'i 141, 145, 925 P.2d 311, 315 (1996). A COL will not be overturned if supported by the trial court's findings of fact and the application of the correct rule of law. *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994).

## III. *DISCUSSION*

Appellant claims the circuit court erred when it granted the BLNR's motion for summary judgment and held that: (1) the BLNR's policy of instructing appraisers to disregard the remaining term of the homestead lease was consistent with the legislative history and intent of HRS § 171–99(a) (1993); (2) the appraisal provisions of HRS § 171–79 (1993) [3] provide a legal basis for appraising fee patents under HRS § 171–99(a); (3) the court was required to defer to the BLNR's interpretation of "fair market price"; (4) the buyer of a fee patent was not entitled to credit for the remaining term on a 999–year lease; and (5) because the legislature had not taken any action to overturn the BLNR's policy, the court had to abide by the BLNR's definition of "fair market price." [4]

### A. *Applicable Rules of Statutory Construction.*

We interpret statutes *de novo*. *Shimabuku v. Montgomery Elevator Co.*, 79 Hawai'i 352, 357, 903 P.2d 48, 51 (1995). When construing a statute, the starting point is the language of the statute itself. *Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 63, 868 P.2d 1193, 1210, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994); *see also Mathewson v. Aloha Airlines, Inc.*, 82 Hawai'i 57, 71, 919 P.2d 969, 983 (1996) (citation and internal quotation marks omitted). "[C]ourts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed

as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *State v. Kaakimaka*, 84 Hawai'i 280, 289–90, 933 P.2d 617, 626–27 (quoting *State v. Ortiz*, 74 Haw. 343, 351–52, 845 P.2d 547, 551–52, *reconsideration denied*, 74 Haw. 650, 849 P.2d 81 (1993)), *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997). Words are given their common meaning unless some wording in the statute "requires a different interpretation." *Saranillio v. Silva*, 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995) (citing *Ross v. Stouffer Hotel Co. (Hawaii), Ltd.*, 76 Hawai'i 454, 461, 879 P.2d 1037, 1044–45 (1994)).

Moreover,

[a]lthough the intention of the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction ... does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citations, brackets, internal quotation marks, and ellipses points omitted). *See also Kaakimaka*, 84 Hawai'i at 280, 933 P.2d at 617.

Finally, "[a] rational, sensible and practicable interpretation [of a statute] is

---

3. *See infra* section III.B.

4. Although Appellant cites this as a point of error, the argument section of his brief does not address this contention at all. Instead, he argues

again that the BLNR's appraisal policy "is at variance with explicit provisions of HRS § 171–99(a)."

preferred to one which is unreasonable or impracticable," *State v. Lobendahn*, 71 Haw. 111, 112, 784 P.2d 872, 873 (1989) (citations and internal quotation marks omitted) (brackets in original), because "[t]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *State v. Arceo*, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (quoting *State v. Malufau*, 80 Hawai'i 126, 137, 906 P.2d 612, 623 (1995) (citation and internal quotation marks omitted)).

### B. *The Plain Language of HRS § 171–99 Supports the BLNR's Valuation Method.*

■ Appellant begins his argument, not with the plain language of the statute, but by leapfrogging into an examination of the legislative history of and intent behind HRS § 171–99(a). He contends that the BLNR's policy of instructing appraisers to disregard the encumbrance of the remaining term of the 999–year lease is contrary to the legislature's goal in enacting the statute.

In accordance with established rules of statutory construction, the starting point of our inquiry is the language of HRS § 171–99(a) (1993), which provides:

> (a) Issuance of land patents to occupier or lessee of homestead lands. A fee simple patent shall be issued to every existing occupier under a certificate of occupation issued heretofore, and to every lessee under a nine hundred and ninety-nine year homestead lease issued heretofore, of public lands, where the lands have been improved under the certificate or lease, or have been used as a place of residence by the occupier or lessee for an aggregate continuous period of not less than ten years *upon payment to the board of land and natural resources of a fair market price, disregarding the value of the improvements made by the occupier or lessee, which price shall be determined by appraisal as provided for in this chapter;* provided that the board may exclude from such patents areas required as roadways to other lots.

(Emphasis added.) In other words, qualified homesteaders are permitted to purchase the fee simple interest in their land upon paying a fair market price, which is calculated by (1) following guidelines in chapter 171 and (2) disregarding the value of improvements. The statute clearly mandates that the term "fair market price" be determined by reference to other provisions within chapter 171.

■ Even though a number of sections in chapter 171 refer to appraisals,[5] HRS § 171–79 is the only other provision that provides a method for valuing the fair market price of a remotely comparable interest, *i.e.*, state residential leaseholds:

> **Purchase of fee title by lessee.** At any time after the requirement of construction of a residence upon the premises has been fulfilled and after ten years from the date of the issuance of the lessee's residential lease, any residential lessee who is financially able to purchase the fee title to the premises demised to the lessee by the lessee's residential lease may, if not in default under the terms of the lessee's lease, purchase the fee title at its fair market value determined as of the date of the exercise of the lessee's option to purchase. *The fair market value shall be determined by appraisers and shall exclude the value of improvements erected by the lessee and shall be determined as if the premises were not subject to the residential lease or to any mortgage made by the lessee.*

(Emphasis added).[6] Accordingly, the plain language of HRS § 171–99(a) requires the

---

5. Other sections provide methods for valuing the state's fee interest in land sold to natural disaster victims (HRS § 171–88), public auction leases (HRS § 171–17(a)), and sale of remnants (HRS § 171–53).

6. Appellant asserts that, because other sections of chapter 171—such as HRS § 171–79 and –88—specifically include wording that the value of the lease encumbrance should not be considered, the exclusion of such a directive from HRS § 171–99(a) implies that it should be taken into account in assessing the value of homestead leases. *See, e.g., Richardson*, 76 Hawai'i at 56–57, 69–70, 868 P.2d at 1203–04, 1216 (applying the rule of statutory construction, *expressio unius est exclusio alterius*, meaning that the express inclusion of a provision in a statute implies the exclu-

BLNR to refer to other provisions in Chapter 171 to determine the value of homestead fees. The only other analogous provision, HRS § 171–79, mandates that appraisers ignore both the value of improvements erected on the premises and the leasehold interest itself. Thus, the statute clearly authorizes the BLNR to disregard the lease encumbrance in its valuation methods.[7] To hold otherwise would render the words "as provided for in this chapter," merely "superfluous or surplusage." *See State v. Kwak,* 80 Hawai'i 297, 301, 909 P.2d 1112, 1116 (1995). Accordingly, the circuit court did not err when it concluded that HRS § 171–79 provided a legal foundation for appraising fee patents under HRS § 171–99(a).

### C. *The BLNR's Valuation Method is Consistent With Legislative Intent.*

Appellant, however, fails to explain or distinguish the section of HRS § 171–99(a) highlighted in bold, *supra,* and relies primarily on his characterization of the legislative history of the statute. The 1949 legislative history of JR 12 states that:

> The purpose of [JR 12] is to provide for the issuance of fee simple patent to every homesteader who has contracted for a 999 year homestead of public lands and which lands have been improved under said lease and have been occupied as a place of residence by the lessee for a period of not less than ten years. It provides that said issuance shall be made upon the payment to the Commissioner of Public Lands of a fair price of the land involved without regards to the value of improvements made by said lessee.

Hse. Stand. Comm. Rep. No. 621, in 1949 House Journal, at 1610.

Appellant acknowledges, in his amended opening brief that it was the clear intent of the legislature that all homestead lessees be provided with the *opportunity* to obtain fee patents. Nevertheless, he claims that limiting the "class of fee purchasers to homestead lessees who were financially capable of paying the fair market price, without regard to the encumbrance of the remaining term of the homestead lease ... would frustrate the intent of the legislature to phase out the Homestead Lease program...." Appellant mistakenly equates an opportunity with a guarantee. This interpretation fails, not only on the basis of plain language analysis as discussed, *supra,* but for the following reasons as well.

First, the BLNR asserts that it has always viewed a 999–year homestead lease "as being in the nature of a rent-free grant that terminates upon the sale of the fee interest." This contention has merit when one examines the nature of a residential lease and compares it with that of a homestead lease.

Under our system of real property ownership, title in fee simple absolute affords an owner the greatest number of rights and the highest degree of power:

> The modern fee simple absolute represents the highest concentration of rights and privileges in the hands of an individual that can arise in a particular stage of the political economy. In a fee simple absolute all possible rights and privileges with respect to land are either in the control of the individual owner or of the sovereign.
>
> . . . .

---

sion of another). This reasoning is flawed, first and foremost, because it ignores one of the cardinal rules of statutory construction, namely, that we start with the language of HRS § 171–99(a), which expressly requires that we refer to other provisions in chapter 171, all of which determine fair market value "as if the premises were not subject to the lease." *See, e.g.,* HRS § 171–79. In addition, "[t]he maxim ... exists only as an aid to statutory interpretation and its application should be limited to ascertaining legislative intent *which is not otherwise apparent.*" *International Sav. and Loan Ass'n, Ltd. v. Wiig,* 82 Hawai'i 197, 201, 921 P.2d 117, 121 (1996) (emphasis added) (citation omitted). In our

view, the intent of the legislature is apparent, both from the language of HRS § 171–99(a) and other provisions of HRS § 171–99.

7. Appellant also claims that there is nothing in the legislative history that would indicate that the legislature intended to abrogate the common law rule that a lease encumbrance is normally considered in reaching an estimate of the "fair market price" of a fee simple interest. This argument is flawed inasmuch as the plain language of the statute directs us to other provisions of chapter 171 for appraisal methods, and these exclude the value of a lease.

*The "absolute" in the fee simple implies the right of the owner to have uncontrolled use and disposition of all of the legal and physical properties therefor. It contemplates the untrammeled power of alienation.* Such alienation may be inter vivos or post mortem. It may be voluntary or involuntary. . . . *Thus the holder of the fee simple absolute may: (a) freely alienate inter vivos and create any estate in the grantee recognized by law; (b) he may devise the property by exercising the legal method authorized by the jurisdiction and so may cut off without condition any prospective heir; (c) subject the property or any portion thereof to sale for payment of debts; (d) treat the property in any manner without anyone being legally able to object to "waste" so long as the holder does not transgress public policy.*

*Thompson on Real Property* § 17.07 at 453 (David A. Thomas ed. 1994) (emphases added).

The property interests of lessees are more limited. Nevertheless, absent contractual or statutory provisions to the contrary,[8] lessees may freely assign or transfer their interests to others, in keeping with the general policy against restraints on alienation. Roger A.

Cunningham et al, *The Law of Property* § 6.71, at 391 (2nd ed. 1993).

In contrast, homesteaders may not encumber or alienate the property in any way. Appellant cites one example in 1953 where an appraiser followed the BLNR's procedures but filed a dissenting report, arguing that under normal circumstances, the value of the remaining term of a lease should be taken into account. He acknowledged, however, that homestead lessees, unlike traditional residential lessees, do not possess the right to: (1) sublet the premises, (2) assign the lease, (3) dispose or alienate the property by will, gift, or otherwise,[9] (4) use the land as collateral, (5) live elsewhere, (6) maintain anything other than a home upon the land, and (7) subdivide the land.[10] *See* Board of Appraiser, Oahu Land District, Territory of Hawai'i, *Appraisal Report on Homestead Lease numbers 30, 36*, October 29, 1953, Dissenting Report by Y.T. Lum, M.A.I. In other words, a homestead lease, unlike most other leases, has no market value. Consequently, Appellant's analysis is flawed inasmuch as it would result in homesteaders receiving compensation for a land interest that has no value on the open market, an illogical result.[11]

8. Under HRS § 171–73 (1993), for example, residential leaseholders "may mortgage the lease and improvements only for the purpose of financing the construction of a residence upon the premises[.]"

9. The homestead lease cannot be devised, but passes according the HRS § 171–99(e), which provides in pertinent part:

Interests, descent; certificate of occupation or homestead lease. In case of the death of any occupier or lessee under an existing certificate of occupation or existing homestead lease, all the interest of the occupier or lessee, any conveyance, devise, or bequest to the contrary notwithstanding, in land held by the decedent by virtue of such certificate of occupation or homestead lease shall vest in the relations of the decedent as follows:

(1) In the widow or widower;
(2) If there is no widow or widower, then in the children;
(3) If there are no children, then in the widows or widowers of the children;
(4) If there are no such widows or widowers, then in the grandchildren;
(5) If there are no grandchildren, then in the parents or surviving parent;

(6) If there are no parents or surviving parent, then in the sisters and brothers;
(7) If there are no sisters and brothers, then in the widowers or widows of the sisters and brothers;
(8) If there are no such widowers or widows, then in the nieces and nephews;
(9) If there are no nieces or nephews, then in the widowers or widows of the nieces and nephews;
(10) If there are no such widowers or widows, then in the grandchildren of the sisters and brothers;
(11) If there are no grandchildren of any sister or brother, then in the State.

10. The appraisal report acknowledged that "[w]hether or not the present 999 year lease may be disregarded in the valuation is purely a legal matter. . . ."

11. By tendering $1.00 for the State's fee simple interest in Lot 10, Appellant has stated, effectively, that the rights to encumber, alienate, and devise property are of little worth. Arguably, these rights are among the most valuable a property owner can hold. *See* section III.C.

Second, the length of Appellant's lease is not absolutely secured for a set term, rather, its total duration is speculative. Unlike residential leases, a homestead lease may be terminated for reasons other than default, as provided in HRS § 171–99. For example, in the event that there is no successor to the homesteader's interest, the lease ceases. Again, it is logically unsound to hold that Appellant receive credit for an interest he does not currently possess and that, in fact, may never vest.

Third, other subsections within HRS § 171–99 itself support the argument that the lease encumbrance should not be considered when evaluating the fee simple interest. A fundamental rule of statutory construction is that we must give, if possible, effect to all parts of the statute. *Kaakimaka,* 84 Hawai'i at 289–90, 933 P.2d at 626–27 (citation omitted). HRS §§ 171–99(c) and (d) provide in pertinent part:

> (c) ... *At the end of three years from the date of the payment of the first installment,* the holder of a freehold agreement is entitled to a land patent for the premises described therein, if the following conditions, in addition to those set forth herein, have been substantially performed:
>
> > (1) *Payment of the balance of the purchase price in equal installments, in one, two and three years respectively, from the date of the freehold agreement with interest annually at the rate of four per cent; provided that the freeholder may pay the installment before it is due, and thereby stop the corresponding interest* [.]
> > ....
>
> (d) Right of purchase lease; termination, forfeiture, or surrender. Upon the termination of a right of purchase lease ... the board may in its discretion and

within the limit of its authority open the premises or any part thereof for disposition.... Before the disposition the *fair market value* thereof shall be established by appraisal. *The value attributable to the improvement in the appraisal shall be paid to the surrendering lessees or freeholders, upon resale of the premises,* and the director of finance shall pay the amount of the valuation upon the requisition of the board out of such funds.[12]

(Emphases added.) Subsection (c) contemplates payment for the fee patent in installments. Once again, it would be illogical to assume that the legislature intended that the lease encumbrance be factored into an appraisal, inasmuch as the value of the fee would always be a nominal sum, *e.g.,* $1.00, and then require that this amount be paid in three installments. In addition, subsection (d) clearly authorizes the BLNR to take into account only the improvements upon the land, not the remaining term of the lease. Taken together, these provisions further strengthen the conclusion that the BLNR has correctly excluded the remaining term of the leasehold from the appraisal process.

■ Fourth, in 1994, the legislature rejected the argument that the fee patents on homestead leases should be sold for $1.00. House Bill No. 3113 was submitted in an effort to amend HRS § 171–99 to that effect, but the bill died in committee. A court may look to "subsequent legislative history or amendments to confirm its interpretation of an earlier statutory provision." *Franks v. City and County of Honolulu,* 74 Haw. 328, 340 n. 6, 843 P.2d 668, 674 n. 6 (1993). Presumably, the legislature was aware of the status of the law and the policies of the BLNR, yet declined to amend the statute. *Cf. Hawai'i State AFL–CIO v. Yoshina,* 84

---

**12.** Under HRS § 171–99(f), only cotenants may purchase the lease interest from each other:

> (f) Option of cotenant to compel others to buy or sell. In case two or more persons become cotenants under any existing right of purchase lease, certificate of occupation, or homestead lease by inheritance or otherwise, any one or more of such persons less than the whole number may file in the office of the land agent an offer to the remainder of the persons to buy their interest in the premises or to sell

them their own interest therein at a stated price according to the proportion of the respective interest in question, and may deposit with the land agent the amount of the offered price in money, with a fee of $10. The land agent shall thereupon notify the persons to whom the offer is made of the nature of the offer and order them to file with the land agent their answer within sixty days whether they will buy or sell according to the offer....

Hawai'i 374, 377, 935 P.2d 89, 92 (1997) ("drafters of a constitutional provisions 'are presumed to have known the existing law and to have drafted the .... provisions in light of that knowledge.' "). Therefore, if the legislature had intended the BLNR to charge $1.00 for the fee interest, it would have done so directly, rather than use the term "fair market price." Moreover, it would not have required (1) an appraisal that (2) excluded the value of improvements on the land, if the fee were to be reduced by the 999–year leasehold interest, which, in turn, would always diminish the value of the fee interest to a nominal sum. If that were the case, an appraisal would be patently unnecessary, and the relevant portion of the statute would be superfluous.

 Finally,

[it] is a well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

*Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 424, 653 P.2d 420, 426 (1982) (citations omitted). In *Treloar,* this court overruled an ICA decision in favor of the party challenging the Labor and Industrial Relations Appeals Board's interpretation of HRS § 386–89(c). Quoting *Waikiki Resort Hotel, Inc. v. City & County of Honolulu,* 63 Haw. 222, 242–43, 624 P.2d 1353, 1368 (1981), the court restated its prior holding that

administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful.... *The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.*

*Treloar,* 65 Haw. at 424, 653 P.2d at 426 (emphasis added). Moreover,

In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

*In re Application of Hawaii Elec. Light Co. Inc.,* 60 Haw. 625, 629, 594 P.2d 612, 617 (1979) (citations omitted).

Since the enactment of JR 12, the contemporaneous construction of those mandated to enforce the statute consistently has been to exclude the speculative value—if any—of the lease from the appraisal process. For example, in 1953, the Board of Appraisers requested guidance from the Public Land Commissioner, who stated that:

The law does not require a Homesteader to give up any rights he may presently be enjoying as a lessee but leaves the matter of whether he desires a change in status squarely up to him. Consequently, this appraisal should be made on the premise that the homestead lease will be canceled, and the value of the lessees' interest under the 999 year homestead lease should be disregarded.

John H. Bay & Jane vanSchaick, *Analysis of the 999 Year Homestead Lease Program,* January 10, 1994 (quoting Letter from Marguerite K. Ashford, Public Lands Commission to Board of Appraisers, June 1, 1953). Thus, the BLNR's interpretation of HRS § 171–99 should be accorded deference, inasmuch as (1) it is consistent with the contemporaneous construction—in the 1950s—of those responsible for implementing the statute, (2) it is not palpably erroneous, and (3) the results are neither unreasonable nor unjust. The legislature afforded homesteaders the right to either remain on the land, rent-free, or to purchase the fee patent of their leasehold at a "fair market price."

## IV. *CONCLUSION*

Because (1) the plain language of the statute itself, (2) its legislative history, (3) recent legislative activity, and (4) the deference accorded administrative rulings support the final conclusion reached by the circuit court, we affirm the order and judgment granting the BLNR's motion for summary judgment and the order denying Appellant's motion for summary judgment.