45 P.3d 798

**Russell BLAIR, Plaintiff–Appellee,**

v.

**Jeremy HARRIS, in his individual capacity and as Mayor of the City and County of Honolulu, Defendant–Appellant.**

No. 24986.

Supreme Court of Hawai'i.

May 7, 2002.

William C. McCorriston, Robert G. Klein, and Peter J. Hamasaki, Honolulu, (of McCorriston Miller Mukai MacKinnon), on the briefs, for defendant-appellant Jeremy Harris.

William J. Deeley, Dennis W. King, and Charles R. Prather, Honolulu, (of Deeley, King & Pang), on the briefs, for plaintiff-appellee Russell Blair.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ., and RAMIL, J., concurring separately, and ACOBA, J., concurring in part and dissenting in part.

Opinion of the Court by MOON, C.J.

Defendant-appellant Jeremy Harris appeals from the March 11, 2002 order of the First Circuit Court, the Honorable Sabrina M. McKenna presiding, granting declaratory relief in favor of plaintiff-appellee Russell Blair, and from the March 14, 2002 entry of judgment thereon. The circuit court ruled that article 2, section 7 of the Hawaiʻi Constitution [hereinafter, section 7], which requires any elected public officer to resign from office "before being eligible as a candidate for another public office, if the term of the office sought begins before the end of the term of the office held[,]" required Harris to have resigned from his office as Mayor of the City and County of Honolulu by the time that he filed a gubernatorial campaign spending organizational report on May 15, 2001. Harris contends that the circuit court erred because "filing nomination papers under [Hawaiʻi Revised Statutes (HRS) § 12–2 (Supp.2001)] is the relevant point in time for purposes of being forced to resign under [section 7.]"

We hold that, under section 7, a public officer becomes "eligible as a candidate for another public office" at the time he or she files nomination papers for the second office. Therefore, he or she must resign from his or her present office before filing nomination papers for the second office, if the term of the office sought begins before the end of the term of the office held. Accordingly, we reverse the judgment of the circuit court.

## I. BACKGROUND

Harris is the current mayor of the City and County of Honolulu. His term of office began on January 2, 2001 and will expire on January 2, 2005. In April 2001, Harris announced his intention to run for the office of Governor of the State of Hawaiʻi. On May 15, 2001, Harris filed a gubernatorial campaign organizational report with the Campaign Spending Commission. A committee working on behalf of Harris has raised more than $100,000 in support of his quest for the governor's office. The general election for governor is in November of this year. The deadline for filing nomination papers for the election is July 23, 2002. The term of the newly-elected governor will begin on Monday, December 2, 2002. Thus, the term of the office that Harris seeks will commence before the term of the office he presently holds expires. As of this date, Harris has not filed nomination papers and has not resigned his current office as mayor.

On January 3, 2002, Blair, a resident, taxpayer, and registered voter in Honolulu, filed a complaint for declaratory relief in the circuit court. Blair sought: (1) a declaratory judgment that Harris violated section 7 because he was required to resign his current position as Mayor when he filed his gubernatorial campaign organizational report pursuant to HRS § 11–194(a) (Supp.2001);[1] and (2)(a) an injunction restraining Harris from continuing to serve as Mayor and removing him from that office or, alternatively, (b) an injunction restraining Harris from soliciting campaign contributions or making campaign expenditures and requiring Harris to withdraw his campaign organizational report. Blair subsequently moved for partial sum-

---

1. HRS § 11–194(a) provides in relevant part:
   Each candidate, committee, or party shall file an organizational report ... within ten days from the date a candidate or candidate committee receives any contributions or makes any ex-

penditures, the aggregate amount of which is more than $100, or, within ten days from the date a noncandidate committee receives any contributions or makes any expenditures, the aggregate amount of which is more than $1,000.

mary judgment as to the declaratory relief sought. Harris moved for judgment on the pleadings or, in the alternative, summary judgment on the ground that section 7 does not require him to resign until he files nomination papers pursuant to HRS § 12–3(a).[2]

Following a consolidated hearing on March 11, 2002, the circuit court ruled in favor of Blair and against Harris. The court ruled that section 7 became applicable to Harris "at least" at the time he filed his campaign spending organizational report. The court's ruling was based on its determination that the phrase "eligible as a candidate" was "patently ambiguous" as between the interpretations offered by either party. In order to resolve this ambiguity, the circuit court looked primarily to its perception of the intent of the framers of section 7 and of the voters who ratified it, the ordinary meaning of the word "candidate," and the objectives sought to be served by section 7. The circuit court determined that all of the foregoing considerations weighed in favor of Blair's position. The court subsequently stayed its order pending appeal, and a judgment certified pursuant to Hawai'i Rules of Civil Procedure Rule 54(b) (HRCP) (2000)[3] was entered March 14, 2002. Harris timely appealed.

## II. STANDARDS OF REVIEW

■ An order granting summary judgment is reviewed *de novo*, using the same standard as that applied by the circuit court: whether there were any genuine issues of material fact and whether the movant was entitled to judgment as a matter of law. *Keliipuleole v. Wilson*, 85 Hawai'i 217, 220–21, 941 P.2d 300, 303–04 (1997) (citation omitted).

■ Issues of constitutional interpretation present questions of law that are reviewed *de novo*. *Price v. Zoning Bd. of Appeals*, 77 Hawai'i 168, 171–72, 883 P.2d 629, 632–33 (1994).

In construing the constitution, we observe the following basic principles:

Because constitutions derive their power and authority from the people who draft and adopt them, we have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the

2. HRS § 12–3(a) provides:
   No candidate's name shall be printed upon any official ballot to be used at any primary, special primary, or special election unless a nomination paper was filed in the candidate's behalf and in the name by which the candidate is commonly known. The nomination paper shall be in a form prescribed and provided by the chief election officer containing substantially the following information:
   (1) A statement by the registered voters signing the form that they are eligible to vote for the candidate;
   (2) A statement by the registered voters signing the form that they nominate the candidate for the office identified on the nomination paper issued to the candidate;
   (3) The residence address and county in which the candidate resides;
   (4) The legal name of the candidate, the name by which the candidate is commonly known, if different, the office for which the candidate is running, and the candidate's party affiliation or nonpartisanship; all of which are to be placed on the nomination paper by the chief election officer or the clerk prior to releasing the form to the candidate;
   (5) Space for the name, signature, date of birth, social security number, and residence address of each registered voter signing the form, and other information as determined by the chief election officer;
   (6) A sworn certification by self-subscribing oath by the candidate that the candidate qualifies under the law for the office the candidate is seeking and that the candidate has determined that, except for the information provided by the registered voters signing the nomination papers, all of the information on the nomination papers is true and correct;
   (7) A sworn certification by self-subscribing oath by a party candidate that the candidate is a member of the party;
   (8) A sworn certification by self-subscribing oath, where applicable, by the candidate that the candidate has complied with the provisions of article II, section 7, of the Constitution of the State of Hawai'i;
   (9) A sworn certification by self-subscribing oath by the candidate that the candidate is in compliance with section 831–2, dealing with felons, and is eligible to run for office; and
   (10) The name the candidate wishes printed on the ballot and the mailing address of the candidate.

3. HRCP Rule 54(b) permits the circuit court to direct the entry of a final judgment as to fewer than all of the claims or parties "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent. This intent is to be found in the instrument itself.

... [T]he general rule is that, if the words used in a constitutional provision are clear and unambiguous, they are to be construed as they are written. In this regard, the settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them.

Moreover, a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it.

*Hawaiʻi State AFL–CIO v. Yoshina*, 84 Hawaiʻi 374, 376, 935 P.2d 89, 91 (1997) (internal quotation marks, citations, brackets, and ellipsis points omitted).

### III. *DISCUSSION*

■ Section 7 states:

Any elected public officer shall resign from that office before being eligible as a candidate for another public office, if the term of the office sought begins before the end of the term of the office held.

Harris contends that the plain language of section 7 supports the conclusion that the act of filing nomination papers triggers the resignation requirement. The critical question turns on the meaning of the phrase "eligible as a candidate[.]" A candidate is "a person who seeks an office, honor, etc.[,]" or "a person selected by others as a contestant for an office, honor, etc." *Random House College Dictionary* 197 (Rev. Ed.1979).

■ We believe that the circuit court, in essentially determining that Harris "sought" the office of Governor when he filed campaign organizational reports, failed to give effect to all of the words of section 7. "Courts are bound to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void, or

insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Keliipuleole*, 85 Hawaiʻi at 221, 941 P.2d at 304 (citations, brackets, and internal quotation marks omitted); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it."); *Oneida Indian Nation of New York v. New York*, 691 F.2d 1070, 1085 (2d Cir.1982) ("It is the court's duty in such circumstances to make every effort to give effect [to] every word of a constitution, to resolve ambiguities, and to reconcile inconsistencies." (Citations and internal quotation marks omitted.)). In particular, the circuit court failed to give effect to the word "eligible."

■ The word "eligible" must be construed so as to give it meaning within the context of section 7. "Eligible" means "fit or proper to be chosen" or "legally qualified to be elected or appointed to office." *Random House College Dictionary* at 429. Thus, the resignation requirement is triggered when an individual becomes "qualified" to "seek" office as a candidate. The "eligibility" or "qualification" requirement must be significant in helping to determine the definition of the word "candidate." If the "eligibility" or "qualification" requirement did not help to shape the meaning of the word "candidate," any valid officeholder would always be "qualified" to "seek" another office as a candidate. Thus, the officeholder would be required to resign immediately upon taking office. Clearly, such an absurd result was not intended. The question, therefore, focuses on how the phrase "eligible as a candidate" determines the definition of "candidate."

■ In discussing the language of section 7, the circuit court stated that *"[t]he court is not aware of any legal requirement for a person running for office to establish 'legal qualification to serve'* at the time of filing a campaign [o]rganizational [r]eport or *at any other time before the filing of nomination papers,* at which time a candidate must certify that he or she is legally qualified to serve in the office sought." (Emphases added.)

We believe that the foregoing statement answers the question in this case. The parties point to no other provisions in the statutes that establish qualifications for seeking office other than those attendant to the nomination requirements in HRS § 12–3. Contrary to Blair's contention, an individual does not become "eligible" or qualified to be a candidate solely because the law mandates that the individual file a campaign organizational report as soon as the individual receives contributions of, or expends, $100 in support of a potential campaign. *See* HRS § 11–194. We do not believe that any individual who contemplates running for another office, or who, by filing a campaign organizational report seeks to ascertain whether he or she can garner sufficient support to run for office, automatically becomes "qualified" for such office by virtue of those actions. Although filing a report may be a necessary step in the process of running for office, this requirement alone is insufficient to establish an individual's eligibility or qualifications "as a candidate."

Moreover, the framers of section 7 are deemed to have been aware of the statutory scheme in effect at the time that section 7 was promulgated. *See Hawaii State AFL–CIO v. Yoshina*, 84 Hawai'i 374, 377, 935 P.2d 89, 92 (1997). Section 7 was promulgated at the Constitutional Convention of 1978, *see* Stand. Comm. Rep. No. 72 in 1 *Proceedings of the Constitutional Convention of Hawai'i of 1978*, at 678 (1980), and HRS chapter 12 existed substantially in its current form at that time. *Compare* HRS chapter 12 (1976 & Supp.1977) *with* HRS chapter 12 (1993 & Supp.2001). This contemporaneous understanding is further supported by the fact that the legislature amended HRS § 12–3(a) shortly after the 1978 Constitutional Convention to require that a person filing nomination papers comply with section 7 by the time of the filing. *See* 1980 Haw. Sess. L. Act 264, § 2 at 499–500 (codified at HRS § 12–3(a)(8)). Accordingly, a public officer becomes "eligible as candidate for another public office" at the time he or she files nomination papers for the second office. Therefore, he or she must resign from his or her present office before filing nomination papers for the second office, if the term of the office

sought begins before the end of the term of the office held.

We do not discern a contrary intent in the constitutional history, the ordinary meaning of the term "candidate" as it is used in section 7, or the objectives to be served by section 7. The Committee on Bill of Rights, Suffrage and Elections of the 1978 Constitutional Convention reported on section 7 as follows:

> Your Committee believes that it would be justified to require a person to resign from office before becoming *eligible to run* for another public office with an overlapping term. By running for another office, the person is in effect saying that he no longer wishes to fulfill the responsibilities of the office to which he was elected, and accordingly he should resign from that office. The voters should not be saddled with an elected public official who no longer wishes to fulfill the duties of the office to which he was elected and will do so only if he fails to win election to the other office. This is not fair to the voters, who elected him to serve a full term, and is a violation of the public trust.
>
> . . . .
>
> Your Committee does not believe it would be warranted for a candidate to resign if the office he is seeking has a concurrent term. In this case, he is in effect resigning since, if he loses the election, he does not have an office to return to. He is not abusing his elected office by using it as a safe haven from which to make political forays and return if he proves unsuccessful.

Stand. Comm. Rep. No. 72, *supra* (emphasis added). The voter information booklet at the 1978 general election, which ratified section 7, stated that the amendment "makes any elected public officer who wants to run for another office quit before running for another office if the terms of the office are not the same." None of the foregoing history addresses the dispositive issue of *when* an officeholder becomes "eligible as a candidate" for another office. As stated earlier, the original intent is to be derived primarily from the language of section 7 itself, which we

have already determined can refer to little else than to the time when an individual files nomination papers.

Similarly, Blair's reliance on *In Re Pioneer Mill Co., Ltd.,* 53 Haw. 496, 497 P.2d 549, *reh'g denied,* 53 Haw. 573, 497 P.2d 549 (1972), is misplaced. In *Pioneer Mill,* this court, relying on the "ordinary meaning" of the word "candidate," held that a judge was required to resign his office at the time he availed himself of a campaign headquarters set up for him and made a public announcement that he would run for governor. *See id.* at 498, 497 P.2d at 551. The constitutional provision at issue stated that "[a]ny justice or judge who shall become a candidate for an elective office shall thereby forfeit his office." *Id.* The language of the constitutional provision in *Pioneer Mill* was different from the language at issue here because (1) the meaning of the word "candidate" in *Pioneer Mill* was not shaped by the word "eligible" as it is in section 7 and (2) the provision related solely to judges, as opposed to "elected public officers."

Finally, the parties dispute the applicability to this case of the various "objectives" of section 7 as they are discussed in *Fasi v. Cayetano,* 752 F.Supp. 942 (Dist.Haw.1990). In *Fasi,* the court summarized these objectives, which were put forth by the state in defending the constitutionality of section 7, as follows:

> First, the resign-to-run law encourages elected public officials to devote themselves exclusively to the duties of their respective offices. Second, the resign-to-run amendment reduces the possibility of public subsidies for officials merely using public office as a "stepping stone" to higher office. Third, the provision prevents abuse of office before and after an election. Fourth, it protects the expectations of the electorate in voting a candidate into office. Fifth, the resign-to-run amendment ensures loyalty of public servants to their electorate. Finally, the rule minimizes the possibility of disruptions in public office and reduces the need for special elections.

*Id.* at 951. Assuming these to be the policy arguments for the existence of section 7, they are on the whole equally applicable to either party's interpretation of when the resignation requirement is triggered. Consequently, they are not useful in determining that date.

## IV. CONCLUSION

Based on the foregoing, we hold that under article 2, section 7 of the Hawai'i Constitution, a public officer becomes "eligible as a candidate for another public office" at the time he or she files nomination papers for the second office. Therefore, he or she must resign from his or her present office before filing nomination papers for the second office, if the term of the office sought begins before the end of the term of the office held. Accordingly, we reverse the judgment of the circuit court.

### Concurring Opinion by RAMIL, J.

I agree with the article II, section 7 analysis as laid out in the concurring opinion of Justice Acoba, and thus join sections I through VII of his concurrence.

### Opinion of ACOBA, J., CONCURRING IN PART AND DISSENTING IN PART

I believe that (1) the circuit court's decision must be reversed, but on the analysis set forth herein, (2) the resignation requirement of article II, section 7 applies *before* the filing of nomination papers rather than after such filing, for the reasons stated herein, and (3) in the public interest, oral argument should have been convened in this case.

### I.

In construing our constitution, we must give words their ordinary meaning. " '[T]he settled rule is that in the construction of a constitutional provision the words are presumed to be used in their natural sense unless the context furnishes some ground to control, qualify, or enlarge them.' " *Hawaii State AFL–CIO v. Yoshina,* 84 Hawai'i 374, 376, 935 P.2d 89, 91 (1997) (quoting *Pray v. Judicial Selection Comm'n,* 75 Haw. 333, 342, 861 P.2d 723, 727 (1993)). This well-established rule for construction of state constitutions requires that we look to the plain language of the constitution, rather than

"any ... abstruse meaning in the words employed." 1 T.M. Cooley & W. Carrington, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 143 (8th ed.1927). The rule of plain language construction is even more crucial when construing constitutions than it is for interpreting statutes, for, when ascertaining the intent of the drafters, it is also the intent of the people ratifying the constitution that must be found. *See id.*

> For as the constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any ... abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.

*Id.* (emphasis added). In the instant case, then, the question is what meaning to give the words "eligible as a candidate" in article II, section 7 of the Hawai'i Constitution,[1] applying the plain language canon of statutory construction.

1. Article II, section 7 mandates that "[a]ny elected public officer shall resign from that office before being eligible as a candidate for another public office, if the term of the office sought begins before the end of the term of the office held."

2. "Eligible" is defined as "[f]it and proper to be chosen; qualified to be elected[; c]apable of serving, legally qualified to serve[; c]apable of being chosen, as a candidate for office[; a]lso, qualified and capable of holding office." *Black's Law Dictionary* 457 (5th ed.1979).

3. *Black's Law Dictionary* defines "candidate" as "[o]ne who seeks or offers himself [or herself], or is put forward by others, for an office, privilege, or honor[; a] nominee." *Id.* at 187.

4. Notably, Hawai'is election laws do not allow for write-in votes. *See Burdick v. Takushi*, 504 U.S. 428, 437, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

5. HRS § 12–1 reads, "All candidates for elective office, except as provided in section 14–21 [re-

It cannot be seriously disputed that "eligible" denotes the status of being qualified to serve, to be chosen, to be elected.[2] A candidate plainly includes one who seeks office.[3] Thus, "eligible as a candidate" in the context of article II, section 7 means that one has attained the status to serve, to be chosen, to be elected to an office he or she seeks. In that regard, there is, therefore, only one manner in which one can become "eligible as a candidate," and that is to officially file nomination papers for the office chosen.[4] *See* Hawai'i Revised Statutes (HRS) §§ 12–1 (1993)[5] & –3 (Supp.2001).[6] And as article II, section 7 states, one "must resign" before that status may be realized.

## II.

In connection with article II, section 7's directive that one "shall resign ... *before* being eligible," (emphasis added), HRS § 12–3(a)(8) plainly requires a candidate to submit "a sworn certification by self-subscribing oath, where applicable, by the candidate that the candidate *has* complied with the provisions of article II, section 7[.]" (Emphasis added.) Consequently, the legislature also conditions candidacy on the *prior* resignation of an officeholder who comes within the terms of article II, section 7's resign to run provisions. Eligibility to become a candi-

garding the nomination of presidential electors], shall be nominated in accordance with this chapter and not otherwise."

6. HRS § 12–3 (Supp.2001) states in part:

(a) *No candidate's name shall be printed upon any official ballot* to be used at any primary, special primary, or special election *unless a nomination paper was filed in the candidate's behalf and in the name by which the candidate is commonly known.* The nomination paper shall be in a form prescribed and provided by the chief election officer containing substantially the following information:
. . . .
(8) *A sworn certification* by self-subscribing oath, where applicable, *by the candidate that the candidate has complied with the provisions of article II, section 7, of the Constitution of the State of Hawai'i;*
. . . .
(f) *Nomination papers which are incomplete* and do not contain all of the certifications, signatures, and requirements of this section shall be void and *will not be accepted* for filing by the chief election officer or clerk.

date, defined as one who has filed nomination papers, then, hinges on the prior resignation of an officeholder whose term of office overlaps with the office he or she seeks. Therefore, I believe that resignation is required at any time *before* the filing of the papers. Because the nomination papers themselves must verify that a candidate has complied with article II, section 7, it would be incorrect to hold that the resignation requirement arises *after* the filing of such papers.

### III.

To confirm the plain language interpretation of the phrase at issue, we may consider the debates and reports of the 1978 Constitutional Convention. In that connection, I conclude that a plain language interpretation would not clash with the sense of the proceedings. First, the standing committee report regarding the "resign to run" provision in article II, section 7 does not establish the precise stage at which an officeholder must resign to run for another office. *See* Stand. Comm. Rep. No. 72 in I *Proceedings of the Constitutional Convention of Hawai'i of 1978* 678 (1980) [hereinafter Stand. Comm. Rep. No. 72]. This report discusses the provision in broad terms, but was expressly concerned with preventing a candidate who runs for another office and loses the race, from returning to the duties of the first office.[7] *See id.* In the report, the converse situation, in which the official retains the first office while running for a second office which is ultimately *won*, was discussed, but primarily with respect to excluding constitutional convention delegates themselves from such a provision.[8]

(Emphases added.)

7. The standing committee report states:

By running for another office, the person is in effect saying that he [or she] no longer wishes to fulfill the responsibilities of the office to which he [or she] was elected, and accordingly he [or she] should resign from that office. The voters should not be saddled with an elected public official who no longer wishes to fulfill the duties of the office to which he [or she] was elected and will do so only if he [or she] fails to win election to the other office. This is not fair to the voters, who elected him [or her] to serve a full term, and is a violation of the public trust.
Stand. Comm. Rep. No. 72, *supra*, at 678.

Nevertheless, the committee report is very clear that such a public official must resign *at some point prior to the election* in order to avoid a situation where the official either (1) wins and then abandons the first position, or (2) loses and returns to the first position, even though it may be presumed that he or she "no longer wishes to fulfill the responsibilities of the office to which he [or she] was elected." Stand. Comm. Rep. No. 72, *supra*, at 678. When such "forced resignation" should take place is not identified in the standing committee report.

Second, it is evident that a common interpretation of the language of article II, section 7 was not reached by the delegates. Delegate Hale explained that "the language and the wording of [the proposed article II, section 7] were never agreed upon in committee and it's one of my complaints against the committee proposal and the committee report." Comm. of the Whole Debates, September 11, 1978, in II *Proceedings of the Constitutional Convention of Hawai'i of 1978* 711 (1980) [hereinafter Debates] (statement by Delegate Hale). The delegates appeared to agree on a "concept" of resignation, but not necessarily on the details of a resign to run provision.[9] At least two delegates discussed the "concept" of requiring resignation. Delegate Hale explained, "I am for the concept of resignation[.]" *Id.* Delegate Weatherwax, as chairperson of the committee, expounded that,

we've heard here from individuals who feel that the language is clear and sufficient for them, and in other instances, from perhaps one ... who can foresee all sorts of problems.... *I would think that the language*

8. The committee distinguished elected officials from convention delegates, inasmuch as "[t]he convention is a transient body of short duration and as such the elected public official will return to his duties, and your Committee feels that this situation is not akin to the usual one where, if elected, the public official will never return to the duties of his original office." *Id.*

9. Apparently, while it was the "concept" of resignation, rather than the specific language of article II, section 7 that was voted on in committee, "each member [of the committee] had an opportunity .. to examine [the language] at that time and to express any reservations[.]" Debates, *supra*, at 701.

*in and of itself would not be a barrier here, except to look if the language here sufficiently meets the desires of the concept [.]*

Debates, *supra*, at 715 (statement by Delegate Weatherwax) (emphasis added). Delegate Weatherwax suggested that "the language is still broad enough for the concept and yet can be clarified, *perhaps at a later time or by the courts, for an exact determination.*" *Id.* at 716 (emphasis added). Thus, there was no unanimity amongst the delegates as to whether article II, section 7 designated a specific point of resignation.

While delegates spoke of resignation as required when a person "ran" for another office, *see id.* at 708 (statement by Delegate Campbell) ("some of those who favor the measure in the proposal assert that the public is at a disadvantage when an incumbent decides to run for an office"), or sought a different office, *see id.* at 710 (statement by Delegate Tamayori) ("[w]hen an elected official seeks another office"), those benchmarks were not incorporated into the text of section 7. Obviously, they could have been. As Delegate Burgess argued, the "shall resign" clause was not specific and did not describe a point at which resignation is required:

[The language of the resignation clause] says that any elected official "shall resign from that office before being eligible as a candidate for another public office...." *It doesn't say he has to resign if he's seeking that other public office, it doesn't say he has to resign only when he files nomination papers; it simply says he has to resign before being eligible.* As I read that, if any person in any public office—for example, to be governor you have to be 35 years of age before you can be eligible to run for the office of governor. *Now if that wording means what it seems to mean, it would mean that any elected public officer has to resign before he becomes 35 years of age if he ever wants to seek the office of governor. ... [I]f this is intended to cover the situation where somebody who is seeking election to a higher office has to resign, then I believe it should be appropriately amended to state exactly that, and it does not state that at this time.*

*Id.* at 713 (statement by Delegate Burgess) (emphases added). I cannot agree with the circuit court, then, that "it appears that the framers understood that the provision would require resignation when an elected official began to seek or run for higher office, not when the elected official officially files nomination papers[.]" The convention's history demonstrates that what the delegates agreed to agree to was a unifying concept.

### IV.

A plain language interpretation also would not conflict with the understanding of the voters ratifying this provision. Contrary to the circuit court's decision, the voter information booklet does not support an alternative view to that of a plain language construction. An informational booklet was part of the Official Ballot presented to voters on November 7, 1978, which "brief[ly] descri[bed] each of the proposed amendments[.]" State of Hawai'i, *Amendments to the State Constitution Proposed by the 1978 Constitutional Convention* 1 (1978) [hereinafter *Voter Information Booklet*]. Proposal 16, describing the section at issue, stated that "resignation of candidates for public office ... makes any elected public officer who wants to run for another office quit before running for any other office if the terms of office are not the same." *Id.* at 2. The circuit court relied upon this abbreviated description in concluding that "the intent of the framers and the voters was to require a person to resign before 'running' for another public office, and not to require resignation at the potentially late stage of filing nomination papers." However, the term "running" connotes a multitude of acts and does not, on its face, suggest any particular time for "quit[ting.]" *Id.* at 2.

Although voters were given these booklets as part of their ballots, the full text of all proposed constitutional amendments was made "available for [the voters'] inspection in [their] voting unit[s]." *Id.* at 1. Accordingly, voters were, at a minimum, given access to the full text of the amendments at their voting units, and were thus not limited to the language of the voter information booklet in approving or disapproving the amendment.

## V.

Not surprisingly, in light of the varying views of the delegates and as suggested by the committee chair, the exact details of the general resignation concept were apparently (and perhaps by default), left to a more definitive construction by the courts or the legislature. Hence, employing the ordinary meaning of the term "eligible" does not contradict the sense of the convention proceedings or the will of the voters. In establishing that an officeholder is "eligible" as a candidate for a second office before nomination papers are filed, I do not believe there is any breach of faith with those delegates who labored hard to adopt a resignation provision, or the voters who ratified it.

## VI.

### A.

Although the circuit court set the eligibility status as of the time when an officeholder files organization papers with the Campaign Spending Commission pursuant to HRS § 11–194 (2001),[10] the framers plainly could not have contemplated such a deadline because that statute was not passed until 1979—after the Constitutional Convention proceedings.[11] Consequently, it cannot be said that the intent of the delegates was that the filing of such a report would require an office seeker to resign. In *Cobb v. State*, 68 Haw. 564, 722 P.2d 1032 (1986), this court determined that

> [i]t is beyond dispute that every "resign to run" provision carries a disability that impinges to some degree on the rights of voters and candidates to choose and be chosen. For this reason, we are extremely reluctant to read into article II, section 7 any resignation requirement that was not clearly intended.

**10.** HRS § 11–194(a) reads, in part, that "[e]ach candidate, committee, or party shall file an organizational report as set forth in section 11–196, within ten days from the date the committee receives any contribution, the aggregate amount of which is more than $100 or makes any expenditure[.]"

**11.** While it is true that in 1978 the framers also ratified those portions of the constitution addressing campaign spending, to wit, article II,

*Id.* at 565–66, 722 P.2d at 1034 (citations omitted). Because the requirement that a potential candidate for office resign his or her current elected position at the time of the filing of the organizational report "was not clearly intended" by the delegates to the Constitutional Convention, I am "extremely reluctant to read into article II, section 7" such a requirement. *Id.*

### B.

I note, also, that the filing of an organizational report pursuant to HRS § 11–194 does not provide reasonable certitude that an elected official will in fact "run" for the second office. The resignation threshold set by the circuit court defines the "triggering event" as the filing of an organization report under HRS § 11–194, which is required once one performs an act falling within the definition of a "candidate" under HRS § 11–191 (Supp.2001). This leads to a variable application of the threshold, in that the point of resignation would vary from candidate to candidate.

HRS § 11–191 defines a "candidate" for the purposes of campaign spending requirements as an individual who alternatively (1) files nomination papers, (2) receives contributions in an aggregate of more than $100, or makes or incurs any expenditures of more than $100, to bring about the individual's nomination for election or election to office, (3) gives consent for any other person to receive contributions or make disbursements to aid in the nomination for election or the election itself, *or* (4) is certified to be a candidate by the chief election officer or county clerk.

However, these criteria governing the filing of an organizational report do not necessarily indicate that the officeholder "is in

sections 5 and 6, the delegates could not have known the details of the legislation implementing these amendments, including any deadlines for any type of reports, as those amendments simply required the establishment of "a campaign fund," that "[t]he legislature shall provide a limit on the campaign spending of candidates[,]" article II, section 5, and that "[l]imitations on campaign contributions to any political candidate . . . shall be provided by law[,]" article II, section 6.

effect saying that he [or she] no longer wishes to fulfill the responsibilities of the office to which he [or she] was elected[.]" Stand. Comm. Rep. No. 72, *supra*, at 678. Initial forays to "test the political waters" are common, as evidenced by Hawai'i Administrative Rules § 2–14.1–12 (2002), which specifically provides for distribution of surplus contributions when a potential campaign languishes due to inactivity, or withdrawal for some other reason.[12] As a result, the threshold adopted by the circuit court would not furnish the people or the courts with any dependable indication that a prospective candidate will in fact relinquish the first office to pursue the second.

## VII.

For the foregoing reasons, I continue to adhere to the view expressed in *In re Application of Arthur Batey for an Order of Quo Warranto Against Marilyn Bornhorst*, S.P. No. 87–0448 (1st Cir.Haw., Feb. 10, 1988), and *In re Application of Ricardo Labez for an Order of Quo Warranto Against Marilyn Bornhorst*, S.P. No. 87–0452 (1st Cir.Haw., Feb. 10, 1988), cited to by the parties: "Setting the time for resigning and setting the point of eligibility as a candidate as that term is used in [a]rticle II[,][s]ection 7 at the point of the nomination papers being filed sets forth a clear[,] definite[,] and ascertainable line and comports with the common sense and reasonable interpretation of [a]rticle II[,][s]ection 7." In light of the text of section 7 and its convention and ratification history, the construction that would best comport with common understanding is that, in order for an elected public officer to become "eligible as a candidate for another public office[,]"

article II, section 7, and file nomination papers pursuant to HRS § 12–3, that person must first resign his or her prior position.

## VIII.

I also take this opportunity to express my concern that oral argument was not heard in the instant case.[13] The significance of this case cannot be overstated: not only does the outcome affect the parties before us and the constituencies of every elected public official who seeks another office, but also the public's interest in the impact of our decision on the election process.

### A.

In deciding cases such as this one, the benefit of oral argument is evident. "Oral arguments can assist judges in understanding issues, facts, and arguments of the parties, thereby helping judges decide cases appropriately." R.J. Martineau, *The Value of Appellate Oral Argument: A Challenge to the Conventional Wisdom*, 72 Iowa L.Rev. 1, 4 (1986) [hereinafter *The Value of Appellate Oral Argument*]. A dialogue among the members of the court and counsel, which is the essence of oral argument, enlivens the written briefs, heightens our awareness of what is significant to the parties, and invigorates our analytical senses.

In my view, we, as justices, better understand the practical ramifications of our decisions when we hold oral argument. As Stanley Mosk, a justice of the California Supreme Court, has explained, "skillful interrogation of counsel from the bench may reveal how a proposed legislative or judicial rule will actually perform in day-to-day practice." S.

---

**12.** Hawai'i Administrative Rule § 2–14.1–12 states in relevant part:

> *Excess; residual; surplus contributions.*
> (f) All contributions received by candidates who have withdrawn or ceased to be candidates because of illness, inactivity or other, or committees directly associated with those candidates, individuals who received contributions but did not file for nomination, or committees or parties which discontinue their activities shall be considered residual and *the candidate or committee shall return all residual private campaign contributions within four years to the original donors* if their identities are known. Whenever the original donor cannot be found

the residual private campaign contributions *may be disbursed* to organizations provided under section 2–14.1–14 *or escheat* to the Hawai'i election campaign fund.
(Emphases added.)

**13.** Hawai'i Rules of Appellate Procedure (HRAP) Rule 34 governs the hearing of oral argument in the appellate courts of this state. HRAP Rule 34(a) states that "[o]ral argument shall be had in all cases except those in which the appellate court before which the case is pending enters an order providing for consideration of the case without oral argument."

Mosk, *In Defense of Oral Argument,* 1 J.App. Prac. & Process 25, 27 (1999) [hereinafter *In Defense of Oral Argument*]. Moreover, such argument also "helps judges avoid becoming too isolated, and serves to remind them that they are not the only participants in the judicial process, and that their decisions directly affect individual lives." *The Value of Appellate Oral Argument, supra,* at 5.

The foregoing benefits of oral argument, particularly in cases like this one, outweigh any perceived disadvantage. In light of the expedited procedure granted by this court, oral argument could have been had without in any way compromising the parties' and the public's interest in a speedy, but deliberate, resolution of this case. Inasmuch as I believe the parties should be entitled to employ oral advocacy in their efforts to persuade us, and we are considering the decision of a circuit court judge who plainly worked earnestly and purposefully in rendering her ruling, I believe oral argument was warranted. In any event, we should take part in a complete deliberative process, for the impact of our decision extends beyond the facts and parties involved in this case.

### B.

As significant, oral advocacy engages the public in understanding the varying points of view of the parties. In this way, oral argument plays an educational function, informing the public as to fundamental legal issues which can, and will, impact our community. Related to that function is the public's perception of our own relationship as an institution of government to the resolution of this dispute. I do not believe it engenders public confidence in our decision when we forego an open and visible airing of the issues.

Finally, I agree, as Justice Mosk contended, that oral argument is in the public interest:

> *First, I believe oral argument to an appellate tribunal serves the public interest.* Primarily it enables the client—a member of the public—to have his point of view presented out in the open to the reviewing court. He believes it is his right, and for that purpose he engages an attorney to make his voice heard. *In addition, the argument and subsequent reporting in the media enable members of the public to hear and understand the contentions of the conflicting litigants. Ordinary observers cannot be expected to see the respective [written] briefs* [.]

*In Defense of Oral Argument, supra,* at 26 (emphases added). It has been observed that "the principal purpose of the argument before the [United States Supreme Court] Justices is ... to communicate to the country that the Court has given each side an open opportunity to be heard [and, t]hus[,] not only is justice done, but it is publicly seen to be done." B. Schwartz & J.A. Thomson, *Inside the Supreme Court: A Sanctum Sanctorium,* 66 Miss. L.J. 177, 196 (1996). This consideration—that justice should always be seen to be done—is applicable to all appellate courts. It is our duty as the court of last resort in this state to foster and maintain this hallmark of American judicial process.