**Electronically Filed
Supreme Court
SCWC-19-0000711
15-DEC-2021
08:58 AM
Dkt. 58 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

IN THE INTEREST OF AA

SCWC-19-0000711

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-0000711; FC-S NO. 16-00249)

DECEMBER 15, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.

OPINION OF THE COURT BY NAKAYAMA, J.

This case arises from a proceeding in the Family Court of the First Circuit (family court) under the Hawai'i Child Protective Act, Hawai'i Revised Statutes (HRS) Chapter 587A (CPA proceeding). Petitioner-Appellant Father appeals from the Intermediate Court of Appeals' (ICA) judgment affirming the family court's determination that (1) Father was properly served with summons to appear in the CPA proceeding by publication; (2) Father's Motion to Set Aside Default should have been denied pursuant to Hawai'i Family Court Rules (HFCR) Rules 55(c) and

60(b); and (3) Father was required to set aside both his default for failure to appear in the CPA proceeding after proper service by publication (default) and the termination of his parental rights, which was entered while he was defaulted (default judgment), before he could move to intervene. Both Father's default and default judgment were entered while the identity of Child's natural father was unknown. On certiorari, Father and Respondent-Appellee Department of Human Services (DHS) argue that Father was not required to set aside the default and default judgment before proceeding with his Motion to Intervene pursuant to HFCR Rules 24(a)(2) and (b)(1).

Based on the plain and unambiguous language of HFCR Rule 24, we agree that Father was not required to set aside the default and default judgment before proceeding with his Motion to Intervene. However, Father's remaining arguments lack merit.

## I. BACKGROUND

### A. Factual Background

On November 30, 2016, Mother gave birth to Child in a Honolulu hospital. Before Mother was discharged from the hospital, "DHS received a report of Physical Neglect, Threat of Abuse and Threat of Neglect of [Child.]" On December 2, 2016, a social worker from the Crisis Response Team interviewed Mother at the hospital. Then, on December 7, 2016, DHS issued an initial Safe Family Home Report.

2

In the Safe Family Home Report, DHS noted that Mother told hospital staff that she did not feel safe going home due to domestic violence by "John," her live-in boyfriend. However, DHS reported that Mother stated "John" was not Child's father and did not know Mother was pregnant. With respect to Child's unknown natural father,[1] DHS reported that, according to Mother, he lived in Chuuk, Micronesia and, like Mother, wanted Child to be placed into foster care. Child was taken into police protective custody on December 2, 2016, and was placed with Respondents-Appellees-Resource Caregivers/Intervenors Craig and Jodilynn Cammack (collectively, "the Cammacks").[2]

## B. Family Court Proceedings[3]

### 1. The CPA Proceeding

On December 7, 2016, DHS filed a Petition for Temporary Foster Custody of Child pursuant to HRS §§ 571-11(9)

---

[1] DHS reported Child's father as "unknown" because Mother initially stated Child's father was in Chuuk and did not provide further information about Child's father. Mother's counsel later stated on the record that Mother did not know the identity of child's father. In addition, Mother testified she did not tell Father about Child when Child was born because, initially, Mother did not know if Father was Child's natural father. Thus, it appears that the identity of Child's natural father was initially unknown to DHS, and Father claimed he was initially unaware he could be Child's natural father.

[2] Although the Cammacks initially did not plan to be Child's permanent placement, they subsequently indicated their desire to adopt Child.

[3] The Honorable Bode A. Uale (Judge Uale) presided over most of the family court proceedings. The Honorable Peter C. K. Fong presided over a December 9, 2016 temporary foster custody hearing. The Honorable Andrew T. Park (Judge Park) presided over a pretrial conference on April 22, 2019.

and 587A-5, initiating the CPA proceeding.  The Petition for Temporary Foster Custody named Mother, but listed Child's father as "unknown" with an unknown address in Chuuk.  Based on the Safe Family Home Report, DHS requested that "Temporary Foster Custody of [Child] be ordered, matters concerning [Child] and other family members be adjudicated, and such other orders as the [family court] deems appropriate be entered."

That same day, DHS also provided a Family Service Plan between Mother and DHS, which was "designed to help the family address and resolve the safety issues as identified by DHS."  To address the identified safety issues, the Family Service Plan provided tasks for Mother such as parenting education, psychological evaluation, and domestic violence services.  With respect to the unknown natural father, the Family Service Plan provided that "[w]hen identified and located, [the unknown natural father] will be assessed and recommended to services."  The final goal of the Family Service Plan was to "[m]aintain a safe family home [for Child] without DHS intervention."

On December 9, 2016, after a Temporary Foster Custody Hearing, the family court entered Orders Concerning the Child Protective Act.  The family court found that continued placement in emergency foster care was necessary to protect Child from imminent harm.  The family court also determined that Mother knowingly and voluntarily stipulated to adjudication of the

Petition for Temporary Foster Custody and the Family Service Plan from December 7, 2016. The family court awarded DHS foster custody over Child. The identity of child's father was not known at the time of this hearing. All parties were ordered to appear at a periodic review hearing on March 2, 2017.

On March 2, 2017, Mother failed to appear at the scheduled periodic review hearing in the family court. Citing a February 16, 2017 report provided to the family court,[4] DHS explained that it was unable to contact Mother and that she missed her scheduled visits with DHS. DHS made an oral motion to serve the unknown natural father by publication to provide notice of the CPA proceeding, which the family court granted. The family court determined that Child should remain in foster custody and scheduled an additional periodic review hearing.

Before the next scheduled periodic review hearing, DHS served the unknown natural father by publication in the Honolulu Star-Advertiser on April 10, 17, and 24, and May 1, 2017. Then, on June 21, 2017, the family court entered default against the

---

[4]   The February 16, 2017 report stated that (1) as of December 9, 2016, Mother was living in a car parked in a park with her sister and sister's children; (2) Mother "no-showed" the visits scheduled on December 15, 2016 and December 22, 2016 and had not contacted DHS; (3) Mother's telephone was disconnected; (4) DHS mailed a letter to Mother at the home of her maternal aunt asking Mother to contact DHS, but received no response; and (5) on February 8, 2017, Mother's maternal aunt reported to DHS that Mother was back with her boyfriend and had no working phone number.

unknown natural father for his failure to appear in the CPA proceeding following proper service by publication.

After additional periodic review hearings with no resolution as to permanent custody of Child, DHS filed a Motion to Terminate Parental Rights of Mother and the unknown natural father on February 21, 2018. The family court heard the motion on February 27, 2018, and Mother did not appear at the hearing. The family court defaulted Mother and the unknown natural father for nonappearance and granted DHS's motion to terminate the parental rights of Mother and the unknown natural father, thereby entering default judgment as to the unknown natural father. In addition, the family court revoked foster custody and awarded permanent custody of child to DHS. The family court also ordered a permanent plan for Child, which included the goal of placing Child for adoption by August 2018, and scheduled a permanency hearing for August 14, 2018.

On August 14, 2018, the family court conducted the permanency hearing and approved adoption as the proper permanency plan for Child. In addition, the family court scheduled another permanency hearing for January 29, 2019.

On October 9, 2018, Father informed DHS via email of his possible paternity and that he recently learned Child was in foster care. In the email, Father "inquired about how he could begin the process of legally bringing [Child] home." After

6

Father contacted DHS, DHS filed a motion for immediate review of Child's case and a hearing was set for December 6, 2018.

### 2. Father's Paternity Action and Motion to Intervene

On November 5, 2018, Father filed a Petition for Paternity for Child.[5]  On January 28, 2019, Father filed a Motion to Intervene in the CPA proceeding under HFCR Rule 24.  The family court took Father's Motion to Intervene under advisement and continued the hearing to March 25, 2019.[6]  On February 22, 2019, Father was adjudicated to be the natural father of Child.

The family court heard Father's Motion to Intervene at the permanency hearing on March 25, 2019.  At the hearing, DHS reported that Child had been living with the Cammacks for over two years and was doing well there.  Next, the family court addressed Father's Motion to Intervene.  The family court explained to Father's counsel that:

> this is . . . going to be a difficult case for your client because of the fact of the passage of time and where the child has been placed almost three years and then your client appears.  So it's not only about your client.  It's also about the safety, welfare, and well-being of the child.  So I cannot give you an automatic intervention in this case, but I am going to set it for trial.

(Emphasis added.)  Father's counsel asked for clarification about the status of Father's Motion to Intervene:

---

[5]    Father's Petition for Paternity for Child was a separate action from the CPA proceeding.

[6]    On February 11, 2019, Father filed a second Motion to Intervene, which was also scheduled to be heard on March 25, 2019.

[FATHER'S COUNSEL]: Just for the -- so I'm clear, on the trial, is the court granting our motion to intervene so[.]

THE COURT: No.

[FATHER'S COUNSEL]: -- we're having a trial on -- on the --

THE COURT: The trial is on whether I'm going to allow [Father] to intervene in this case.

[FATHER'S COUNSEL]: All right.

THE COURT: So your motion to intervene is the subject of the trial.

[FATHER'S COUNSEL]: And I take it the issues are going to be the -- the objections raised in the short report from the [Court Appointed Special Advocates Program] and whatever that's in the permanency plan?

THE COURT: Well, the standard is always best interest of the child so --

[FATHER'S COUNSEL]: Yes.

THE COURT: -- you might want to go on that. Based on all of the things that have happened, it's almost three years this child has been in -- in care. As far as why your client took so long, bring it up at trial. I'm not going to hear anything today.

The family court entered a written order setting Father's Motion to Intervene for trial on May 7, 2019, with a pretrial conference set for April 22, 2019.

On April 22, 2019, Judge Park presided over the pretrial conference. At the pretrial conference, both DHS and Respondent-Appellee Court Appointed Special Advocates (the CASA) stated that it did not object to Father's Motion to Intervene and that a stipulation had been submitted to the family court on or around April 12, 2019. DHS advised Judge Park that it was notified on April 15, 2019, that "the court didn't want to sign

[the stipulation]" because the court "had reservations about signing it[.]" Notwithstanding Judge Uale's reluctance to sign the stipulation allowing Father to intervene, Judge Park stated:

> Well, here's the thing, right. The May 7th date, if no one's going to put up a fight, then I don't see the need to keep a contested hearing on the calendar when it's going to just eat up a court slot. So I guess if everyone's in agreement, [Father] got his own counsel privately, then by stipulation, with no objection of the parties, [Father's] motion . . . to intervene in the proceedings will be granted. He'll be made a party to the case. He shall be noticed through counsel on all matters and papers regarding this case.
> And vacate the May 7th hearing date[.]

When the CASA asked for clarification as to when Father would be considered a party to the case, Judge Park stated that Father's Motion to Intervene is granted and that Father is "a party to the case prospectively" and would be noticed on all matters going forward. That same day, Judge Park entered an order granting Father's Motion to Intervene.

On May 14, 2019, the Cammacks filed a Motion to Intervene in the CPA proceeding, which Father opposed. On May 22, 2019, Judge Uale heard the Cammacks' Motion to Intervene. Judge Uale informed the parties:

> THE COURT: Okay, and I guess [Father] has been made a party by stipulation. So I'm going to make you a party because I don't believe that stipulation was appropriate because I -- you folks sent the stipulation to me, and I returned it because I told you folks I wouldn't sign it, and then when I was gone, I understand the per diem judge that was sitting signed off on the stipulation. The problem is you have -- you have a termination of parental rights so you have to set that aside first in order for your client to intervene. So as far as I'm concerned, that stipulation is void, because in order for you to come into the case, since you're saying that your client is the biological father, I think legally you have to set aside

9

> the prior court order of termination of parental rights. So I don't know how you want to deal with this. I'm certainly happy to give you a trial. But I don't think that stipulation was appropriate just . . . legally.
>
> . . . .
>
> So I'm ready to tell you first I'm setting aside the stipulation to allow [Father] to intervene because I don't think that was appropriate. It's not the per diem judge's fault. I wasn't here. I was on some kind of leave. And I do think that you have a right, but I think you need to file an appropriate motion to set aside default citing the appropriate law in order to have that. So I'm going to allow you to do that, but I'm also going to give you a pretrial and a trial date in order to have that come across.

(Emphasis added.) Judge Uale then instructed Father's counsel to file a written motion to set aside default so that the family court could set pretrial and trial dates to hear the motion. On May 29, 2019, Judge Uale entered a written order (1) granting the Cammacks' Motion to Intervene; (2) setting aside the order granting Father's intervention entered on April 22, 2019; (3) ordering Father to file a written motion to set aside default; and (4) scheduling trial on Father's motion to set aside default. According to the family court, if Father set aside his default, the termination of his parental rights would be reversed by operation of law.

### 3. Father's Motion to Set Aside Default

Father filed a written Motion to Set Aside Default on June 5, 2019, which the Cammacks opposed. In his Motion to Set Aside Default, Father pointed out that "[i]t is well settled that 'defaults and default judgments are not favored

10

and . . . any doubt should be resolved in favor of the party seeking relief, so that, in the interests of justice, there can be a full trial on the merits.'" Father contended that he satisfied the following three requirements to set aside a default and default judgment: "(1) that the nondefaulting party will not be prejudiced by the reopening, (2) that the defaulting party has a meritorious defense, and (3) that the default was not the result of inexcusable neglect or a willful act."

First, Father contended that no nondefaulting party would be prejudiced. Father argued that "the only nondefaulting parties would be the State and Mother[]" because "[the Cammacks] were not parties at the time default was entered against Father[.]" In addition, Father pointed out that "DHS and [the] CASA both previously stipulated to Father's [intervention,]" and that Mother did not have rights that could be prejudiced. According to Father, even if prejudice to the Cammacks was considered, "any delay caused by further proceedings can only work to their advantage[]" because Child will have more time to bond with the Cammacks. Father added that "the best interests of [Child] will be served if Father is allowed to make the case that [Child's] best chance for a safe and happy home is with his natural Father, his siblings, and his extended family[.]"

Second, Father claimed he had a meritorious defense. Father pointed out that termination of parental rights "can only

be ordered upon a showing, by clear and convincing evidence, that the parent cannot presently nor is it foreseeable, that a parent could provide a safe home for the child, even with the assistance of a service plan within a reasonable time." Father contended that he could demonstrate that he successfully raised three other children with Mother and could provide a safe home for Child. In addition, Father argued that Mother's domestic violence allegations were false, and that Father had no history of domestic violence. Thus, according to Father, his parental rights would be protected from termination by HRS § 587A-33(a).[7]

---

[7]  HRS § 587A-33(a) (Supp. 2017) provides in relevant part:

> (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
>     (1) A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
>     (2) It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;
>     (3) The proposed permanent plan is in the best interests of the child. In reaching this determination, the court shall:
>         (A) Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and
>         (B) Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care . . . .

12

Third, Father argued that his default was not willful or the result of inexcusable negligence. Father contended that "no effort was made to provide Father with notice of the first hearing in [the CPA proceeding]" because Mother initially thought Father was not Child's natural father. Father claimed that even after he learned of Child two weeks after Child's birth, Father believed Mother when she told him that Father was not Child's natural father, and Father reasonably assumed that Child had been adopted. Furthermore, Father claimed that the service by publication in the Honolulu Star-Advertiser was not proper because he did not, and had no reason to, read that newspaper and the legal notices section. In addition, Father argued that no effort was made to reach Child's alleged father who resided in Chuuk, even though Mother stated she knew who and where Child's father was.

The family court heard Father's Motion to Set Aside Default over a two-day period and received testimony from Father, Mother, and DHS social worker Lena Kakehi (Ms. Kakehi).

Ms. Kakehi testified that she had difficulty locating and meeting with Mother, who was living with unidentified relatives on the beach. Mother told Ms. Kakehi that she was afraid to return home to live with "John" because of domestic abuse, but refused to provide a last name for "John." Mother claimed that she did not know the identity of Child's father.

13

However, Mother also claimed that Child's father was living in Chuuk but Mother did not provide Ms. Kakehi with any contact information for Child's father. Ms. Kakehi also testified that Mother was not interested in receiving any services from DHS, which presented a safety concern. In Ms. Kakehi's opinion, Mother and Father would not provide a safe home for Child, given that Mother would be the primary caretaker for Child if Father's default were set aside.

Mother testified both in Chuukese with the assistance of an interpreter and in English. Mother testified that while visiting Chuuk on March 25, 2016, she met a man named "John" and had sexual relations with him. Mother testified that she thought "John" was the only possible natural father of Child, but at other times Mother testified that she was not sure if Child's natural father was "John" or Father. Initially, Mother testified that she did not tell anyone that she had been a victim of domestic violence and said that she gave up Child because she was fearful that Father would be upset about Child. However, Mother then admitted to telling DHS that she was a victim of domestic violence, claiming that she said that because Child needed a place to stay. After giving birth to Child, Mother was transferred to a psychiatric ward at another hospital and spent four days there. After her discharge from the psychiatric ward, Mother lived in her car before returning to

live with Father. Upon her return to live with Father in December 2016,[8] Father found Mother's medical discharge paperwork following Child's birth and learned that Mother had given birth. Mother testified that she attended two hearings in the CPA proceeding but did not inform Father about the case.

Father testified that he had been in a relationship with Mother for eight years and that they had three children together before Child was born. Father and Mother's first three children lived in Chuuk with their maternal grandmother and Mother lived in Chuuk with them approximately half of each year. According to Father, Mother went to Chuuk shortly after Child was conceived and returned home one month prior to Child's birth. Father stated that Mother's pregnancy was not visible during the month prior to Child's birth and that he did not see Mother unclothed. Father also claimed that Mother did not tell him about any court proceedings, that he did not know anything about adoption proceedings, and that he thought Child had been adopted by the time Father realized he might be Child's natural father.[9]

---

[8] At the contested hearing, Mother testified that she was living with Father, and only lived out of a car for one week after giving birth to Child.

[9] Although Father claimed that he thought Child had been adopted, Child's adoption was never completed and remains pending.

Father admitted that he learned that Mother gave birth to Child in December 2016, but stated that he did not perform any calculations to determine if he was Child's natural father until April 2018, when Mother told Father that she noticed Child's resemblance to Father and provided Father with a picture of Child. Father testified that he immediately started to try and figure out how he could stop Child's adoption process, and claimed that he and Mother went to the DHS office where Ms. Kakehi worked every three weeks from May 2018 to October 2018 without ever making contact with Ms. Kakehi. Father began visiting Child starting on June 23, 2018, while Child was visiting with a maternal aunt, and Father began paying child support for Child in March 2019. Father was able to meet with Ms. Kakehi on October 16, 2018, and was told to hire an attorney. Father hired an attorney the following day.

On September 20, 2019, the family court entered a decision and order denying Father's Motion to Set Aside Default and Motion to Intervene. The family court found "[M]other's testimony not credible and that her reasons for not telling [F]ather of her pregnancy and her subsequent hiding of her pregnancy and giving birth was very convoluted and not believable." The family court further found that "Father's testimony was also not credible, in that he asserted that he did not know of [M]other's pregnancy and subsequent child birth when

16

in fact according to [M]other's testimony she returned to Hawaii and lived with him for a time before she gave birth."  The family court determined that "Father knew or should have known that [Child] was his child yet through his own inaction did not file his motion to set aside default until June 5, 2019[,]" and that "Father has not satisfied the requirements of HFCR 55 or HFCR 60(b) in that his failure to file a motion to set aside his default was inexcusable."  The family court also observed that Child was placed with the Cammacks almost three years earlier and deserved permanency.  Furthermore, the family court found that "[e]ven if [F]ather and [M]other were given an opportunity to raise [Child], [Ms. Kakehi] testified that the home is not safe and it is unknown how long or if the parents would in the reasonably near future would [sic] be able to provide a safe home for [Child]."  Thus, the family court concluded that it was not in "[Child's] best interests that permanency be delayed any longer[,]" and denied Father's Motion to Set Aside Default.

The family court issued its corresponding Findings of Fact and Conclusions of Law on November 19, 2019.  The family court found that "Mother informed DHS that [Child]'s father was in Chuuk but did not provide the name of the biological father to DHS or any contact information for the biological father[,]" and "Mother did not maintain contact with the DHS[]" during the CPA proceeding before termination of her parental rights.  The

17

family court determined that DHS was unaware of additional information regarding Child's father in April and May of 2017 when DHS published notice to the unknown natural father, and on June 21, 2017, when the unknown natural father was defaulted for failure to appear in the CPA proceeding.  The family court also found that Father knew or should have known of the ongoing CPA proceeding between November 2016 and April 2018.  Thus, the family court concluded that Father was properly noticed and served by publication in the Honolulu Star-Advertiser, "and the entry of default and subsequent termination of his parental rights upon his failure to appear based upon [that] notice was appropriate."

Then, the family court analyzed Father's Motion to Set Aside Default under HFCR Rules 55(c) and 60(b).  With respect to HFCR Rule 60(b),[10] the family court determined that it lacked

---

[10]   HFCR Rule 60(b) (Supp. 2016) provides in relevant part:

> Rule 60. Relief from judgment or order.
>
> . . . .
>
> (b) Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud.  On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from any or all of the provisions of a final judgment, order, or proceeding for the following reasons:
>     (1) mistake, inadvertence, surprise, or excusable neglect;
>     (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new

(. . . continued)

jurisdiction to entertain Father's Motion to Set Aside Default under HFCR Rules 60(b)(1), (2), or (3) because Father's Motion to Set Aside Default was filed more than one year after the default and default judgment were entered against Father. The family court also found that HFCR Rules 60(b)(4) and (5) were not applicable to the facts of this CPA proceeding. In addition, the family court determined that Father lacked a meaningful or substantial relationship with Child and that paternity alone does not justify relief under HFCR Rule 60(b)(6). The family court also determined that Father's argument that the Cammacks are Caucasian and Child is not did not justify relief under HFCR Rule 60(b)(6). Furthermore, the family court determined that Father's Motion to Set Aside Default was not brought within a reasonable time after his

---

(continued . . .)

> trial under Rule 59(b) of these rules or to reconsider, alter, or amend under Rule 59(e);
> (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or
> (6) any other reason justifying relief from the operation of the judgment.
> The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceedings was entered or taken. . . .

default was entered or his parental rights were terminated, and that granting the motion would not be in Child's best interests. Thus, the family court concluded that Father was not entitled to relief under HFCR Rule 60(b).

With respect to HFCR 55(c),[11] the family court noted that "a motion to set aside a default must show (1) that the non-defaulting party will not be prejudiced by the reopening; (2) that the defaulting party has a meritorious defense; and (3) that the default was not the result of inexcusable neglect or a willful act on the part of the moving party."

The family court determined that Child was a party to the CPA proceeding. Furthermore, the family court found that

> [Child] would be prejudiced by reopening the case because (1) [Child] has been in foster care for approximately 3 years and [Child] is entitled to permanency and closure; (2) Mother and Father are not presently able to provide a safe family home for [Child], even with the assistance of services; (3) there is no indication when, or if, Father would be able to provide a safe family home for [Child] if the default were to be set aside; (4) [Child] is strongly bonded to [the Cammacks] just as they are to [Child]; (5) [Child] is not bonded to Mother or Father; (6) [Child] is thriving in his current placement and (7) there are no compelling reasons documented in the record that would justify preventing [Child] from permanency and closure.

---

[11]    HFCR Rule 55(c) (Supp. 2016) provides:

Rule 55. Default.

. . . .

(c) Setting aside default. For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b) of these rules.

The family court also determined that "Father does not have a meritorious defense to the default[]" and that "[t]he default and the subsequent termination of parental rights was the result of inexcusable neglect on the part of Father." Thus, the family court concluded that "Father has not shown good cause to set aside the default or the termination of his parental rights as required by [HFCR] Rule 55(c) . . . ."

The family court accordingly denied Father's Motion to Set Aside Default and his Motion to Intervene.

**C.   ICA Proceedings**

On October 16, 2019, Father filed a notice of appeal. Father argued that the ICA should reverse the family court's September 20, 2019 decision denying his Motion to Set Aside Default. With respect "to the related Findings of Fact and Conclusions of Law entered by the family court on November 19, 2019[,]" Father argued that the ICA should "reverse the orders, judgments and decrees set forth therein that reiterate the [family] court's denial of his Motion to Set Aside Default, and also deny his Motion to Intervene." In his opening brief, Father raised three points of error.

First, Father argued that the family court mistakenly concluded that Father was duly noticed and served by publication, and that the family court had personal jurisdiction over him. In particular, Father challenged the family court's

findings of fact regarding whether DHS knew or should have known the identity or location of Child's natural father when DHS served the unknown natural father by publication, and whether Father knew or should have known of the ongoing CPA proceeding from November 2016 to April 2018.  Father admitted that service by publication is permissible pursuant to HRS § 587A-13(c)(2).[12] However, Father contended that the family court failed to inquire into DHS's efforts to locate the unknown natural father or make any finding that personal service on Child's father in Chuuk was impracticable.  Father maintained that if there was such an inquiry, the family court would have found that Mother

_____

[12]   HRS § 587A-13 (Supp. 2016) sets forth the requirements for summons and service of summons in a CPA proceeding and provides in relevant part:

> (a) After a petition has been filed, the court shall issue a summons requiring the presence of the parents[.]
>
> . . . .
>
> (c) The sheriff or other authorized person shall serve the summons by personally delivering a certified copy to the person or legal entity being summoned. . . . [P]rovided that:
>
> . . . .
>
> (2) If the court finds that it is impracticable to personally serve the summons, the court may order service by . . . publication . . . .  When publication is used, the summons shall be published once a week for four consecutive weeks in a newspaper of general circulation in the county in which the party was last known to have resided.  In the order for publication of the summons, the court shall designate the publishing newspaper and shall set the date of the last publication at no less than twenty-one days before the return date.  Such publication shall have the same force and effect as personal service of the summons.

(Emphasis added.)

22

provided DHS with sufficient information to locate Child's father. In addition, Father claimed that, even if personal service was impracticable, service by publication was improper because the summons was published in the Honolulu Star-Advertiser, rather than in a newspaper of general circulation in Chuuk, where Mother initially indicated that Child's natural father resided. Thus, Father contended that the service by publication was void and the family court had no personal jurisdiction over the unknown natural father.

Second, Father claimed that the family court erred in denying Father's Motion to Set Aside Default pursuant to HFCR Rules 55(c) and 60(b). Father argued that because the service by publication was void, the default and default judgment were also void, and thus compliance with HFCR Rule 55(c) was not required. Furthermore, Father argued that even if compliance with HFCR Rule 55(c) was required, Father satisfied the requirements under HFCR Rule 55(c) to set aside the default. Thus, Father challenged the family court's findings of fact and conclusions of law that applied HFCR Rule 55(c) to Father's Motion to Set Aside Default.

Father also contended that the family court erred by concluding that Father was not entitled to relief under HFCR Rule 60(b) because that rule only applies to a motion seeking relief from a final judgment. Father maintained that HFCR Rule

60(b) was inapplicable because no judgment was entered regarding the default. In the alternative, Father argued that the family court erred by concluding that HFCR Rule 60(b)(4) was not applicable in this case, because Rule 60(b)(4) permits a court to relieve a party if the judgment is void, as it was in this case due to defective service. Father also argued that HFCR Rule 60(b)(5) and (6) were applicable in this case, contrary to the family court's conclusion. Thus, Father challenged the family court's findings of fact and conclusions of law that applied HFCR Rule 60(b) to Father's Motion to Set Aside Default.

Third, Father contended that the family court violated his constitutional right to due process by denying intervention. Specifically, Father challenged the family court's FOF 33, which stated that "on May 22, 2019, a stipulation between the DHS and the CASA to permit Father's intervention was determined to be inappropriate by the Court and was therefore set aside."

Father conceded that he "did not specify whether his requested intervention fell under HFCR 24(a) or 24(b)." However, Father contended that intervention under both provisions was proper based on the rule's language. Father maintained that as Child's natural father, he retained visitation rights and financial obligations in relation to Child, and thus was entitled to intervene, especially given that both DHS and the CASA agreed to Father's intervention.

DHS agreed with Father in its answering brief that the family court erred by denying Father's Motion to Intervene because Father satisfied the requirements for both intervention of right and permissive intervention. DHS argued Father has a constitutionally protected interest in the custody and visitation of Child and that Father's Motion to Intervene should have been granted pursuant to HFCR Rule 24(a)(2).[13] DHS argued that Father satisfied the requirements of HFCR Rule 24(a)(2) for intervention of right because Father's Motion to Intervene was timely, in that it was first filed on January 28, 2019, while his Petition for Paternity and the genetic test results were still pending. DHS maintained that even if the unknown natural father's rights were terminated on February 27, 2018, Father still had an interest in Child's custody and visitation once he was adjudicated as Child's natural father.

---

[13] HFCR Rule 24 (2015) provides in relevant part:

> (a) Intervention of right. Upon timely application anyone shall be permitted to intervene in an action:
>
> . . . .
>
> (2) when the applicant claims an interest relating to the property, transaction, or custody, visitation, or parental rights of a minor child which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicants [sic] interest is adequately represented by existing parties.

DHS also contended that Father satisfied the requirements for permissive intervention under HFCR Rule 24(b)(1), which permits intervention "when a statute confers a conditional right to intervene[.]" According to DHS, HRS § 587A-33(c) and (d) conferred a statutory right for a child's family member to intervene post-termination of parental rights, "to have the continuing responsibility to support the child and the opportunity to visit the child at the discretion of the permanent custodian."[14] DHS pointed out that "Father testified that he has continued to pay child support for [Child] and that [Father] has an interest in the custody and visitation of [Child]." In support of this argument, DHS cited to Father's testimony that he (1) started paying child support for Child to the Child Support Enforcement Agency in March 2019 and (2) visited with Child on weekends while Child was visiting with a maternal aunt. DHS asserted that permitting Father to

---

[14] HRS § 587A-33 (Supp. 2014) provides in relevant part:

> (c) Unless otherwise ordered by the court or until the child is adopted, the child's family member shall retain, to the extent that the family member possessed the responsibility prior to the termination of parental rights, the continuing responsibility to support the child, including repaying the cost of any and all care, treatment, or any other service provided by the permanent custodian, any subsequent permanent custodian, other authorized agency, or the court for the child's benefit.
> (d) A family member may be permitted visitation with the child at the discretion of the permanent custodian. The court may review the exercise of such discretion and may order that a family member be permitted such visitation as is in the best interests of the child.

intervene would not unduly delay or prejudice the "original parties" as DHS and Child's guardian ad litem had previously stipulated to Father's intervention.

The Cammacks conceded in a separate answering brief that Father's parental rights are a constitutionally protected liberty interest. However, the Cammacks argued that under federal precedent, Father is entitled to a lesser degree of constitutional protection due to Father's lack of an established substantial relationship with Child.[15] According to the Cammacks, "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." The Cammacks asserted that the family court correctly concluded that Father's Motion to Intervene was untimely, as the record demonstrates that Father was aware of Child's birth and that he might be Child's father in December 2016, yet waited until January 2019 to file his first Motion to Intervene.

The ICA issued a Memorandum Opinion on September 29, 2020, affirming the family court's September 20, 2019 decision

---

[15] The CASA filed an answering brief that incorporated by reference the Cammacks' answering brief. However, the CASA also wished to clarify that by stipulating to Father's intervention, the CASA had "no intention to circumvent Judge Uale's decision not to sign the stipulation" or "go around the direction of Judge Uale."

27

and order denying Father's Motion to Set Aside Default and Motion to Intervene.

First, the ICA reviewed the family court's conclusion that Father was properly served by publication. The ICA noted that at the time DHS served Child's unknown natural father by publication, the only information DHS had about Child's father were Mother's statements that (1) the unknown natural father was in Chuuk and wanted Child to go into foster care; and (2) Mother did not know who the unknown natural father was. The ICA determined that DHS did not know Child's father's name was "John" when DHS moved to serve the unknown natural father by publication. The ICA cited this court's test for whether service by publication is authorized:

> [R]esort to constructive service by publication is predicated upon necessity, and, if personal service could be effected by the exercise of reasonable diligence, substituted service is unauthorized. . . . The test, however, is not whether it was in fact possible to effect personal service in a given case, but whether the complainant reasonably employed knowledge at [their] command, made diligent inquiry, and exerted an honest and conscientious effort appropriate to the circumstances, to acquire the information necessary to enable [them] to effect personal service on the defendant.

Accordingly, the ICA determined that the family court correctly found that Father was properly served by publication.

Furthermore, the ICA determined that the service by publication was not defective because summons for Child's father was published in the Honolulu Star-Advertiser for four consecutive weeks, with a return date more than 21 days after

28

the last publication date, in compliance with HRS § 587A-13. The ICA also rejected Father's claim that publication in the Honolulu Star-Advertiser was defective because the notice was not published in Chuuk, where the unknown natural father allegedly lived, on the basis that Father was later determined to be Child's natural father and lived in Honolulu.

Second, the ICA considered whether the family court erred by declining to set aside the entry of default and the termination of Father's parental rights by default. The ICA agreed with the family court that in order to set aside the default and default judgment, Father was required to satisfy both HFCR Rules 55(c) and 60(b):

> [Father]'s default was entered pursuant to HFCR Rule 55. [Father]'s parental rights were terminated while he was in default, making the termination of parental rights a default judgment. See In re Doe, 77 Hawaiʻi 109, 114, 883 P.2d 30, 35 (1994) (holding that "an infringement upon parental custody rights is an appealable decision even though the requisite finality normally required for appeals is lacking."). Accordingly, [Father] was required to obtain relief under both HFCR Rule 55 and HFCR Rule 60(b). [Father] had the burden of establishing that: (1) Child will not be prejudiced by the reopening; (2) [Father] has a meritorious defense; and (3) [Father]'s default was not the result of inexcusable neglect or a willful act. [Chen v. Mah, 146 Hawaiʻi 157, 173-74, 457 P.3d 796, 812-13 (2020)].

The ICA reviewed the family court's findings of fact that Mother's and Father's testimony was not credible and that Ms. Kakehi's testimony was credible. The ICA also reviewed the family court's findings of fact regarding Father's stated reasons for delay in seeking to set aside his default and

29

whether Father knew or should have known that he was Child's natural father in December 2016. Furthermore, the ICA reviewed the family court's findings of fact regarding Child's best interests. The ICA concluded that the family court's "findings of fact were supported by substantial evidence in the record." In addition, the ICA noted that "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact."

The ICA then considered the family court's conclusions regarding HFCR Rules 55(c) and 60(b), noting that the family court determined that Father did not satisfy the requirements to set aside his default and default judgment pursuant to HFCR Rules 55(c) or 60(b). The ICA reviewed the family court's reasoning for denying Father's Motion to Set Aside Default pursuant to HFCR Rules 55(c) and 60(b) and held "that the family court's conclusions of law were correct . . . to the extent they presented mixed questions of fact and law, they were not 'clearly erroneous,' were supported by the trial court's findings of fact, and reflected an application of the correct rule of law."

Third, the ICA considered Father's claim that the family court's denial of his Motion to Intervene deprived Father of due process. The ICA reasoned that before Father could

30

proceed with his motion to intervene, he had to have both his default and default judgment set aside. Based on the ICA's previous conclusion that the family court did not err in declining to set aside Father's default and default judgment after a two-day evidentiary hearing, the ICA held that Father was not deprived of due process. The ICA also rejected Father's claim that Judge Uale abused his discretion and violated the "law of the case" when he set aside Judge Park's approval of the stipulation to allow Father to intervene. The ICA concluded that Judge Uale provided cogent reasons to set aside the stipulation because Father did not set aside his default and default judgment before moving to intervene.

The ICA entered its Judgment on Appeal on October 27, 2020.[16] On November 2, 2020, Father filed a timely application for writ of certiorari.

## II. STANDARDS OF REVIEW

### A. Family Court Decisions

> Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

---

[16] Father filed a Motion for Reconsideration on October 5, 2020, which the ICA denied because Father presented no "new evidence and/or arguments that could not have been presented during the earlier" proceedings.

31

Fisher v. Fisher, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) (quoting In re Doe, 95 Hawaiʻi 183, 189-90, 20 P.3d 616, 622-23 (2001)).

The family court's conclusions of law are reviewed de novo under the right/wrong standard. In re Doe, 101 Hawaiʻi 220, 227, 65 P.3d 167, 174 (2003), as amended (Apr. 22, 2003). Thus, conclusions of law "are not binding upon an appellate court and are freely reviewable for their correctness." Id. (cleaned up).

B. **Constitutional Law**

"We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." In re L.I., 149 Hawaiʻi 118, 121, 482 P.3d 1079, 1082 (2021) (quoting State v. Ui, 142 Hawaiʻi 287, 292, 418 P.3d 628, 633 (2018)).

C. **Interpretation of Court Rules and Statutory Interpretation**

> "[W]hen interpreting rules promulgated by the court, principles of statutory construction apply." Gap v. Puna Geothermal Venture, 106 Hawaiʻi 325, 331, 104 P.3d 912, 918 (2004) (citation and internal quotation marks omitted). This court's construction of statutes is guided by the following rules:
>
> > First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of

32

> meaning, or indistinctiveness or uncertainty of an
> expression used in a statute, an ambiguity exists.

State v. Choy Foo, 142 Hawai'i 65, 72, 414 P.3d 117, 124 (2018)

(quoting State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170,

1177 (2009)) (internal citation omitted).

### III. DISCUSSION

In his application for writ of certiorari, Father

raises the following points of error:

> A.   Whether the default and default judgment are void for
>      lack of due process and personal jurisdiction, given
>      the family court's failure to follow HRS § 587A-
>      13(c)(2)?
>
> B.   As to application of [HFCR Rules] 55(c) and 60(b),
>      whether the family court's decision and the ICA's
>      Opinion represents grave errors of law or
>      inconsistencies with decisions of the Hawai'i Supreme
>      Court and the United States Supreme Court?
>
> C.   Whether [Father] was required to set aside default
>      and the default judgment terminating his parental
>      rights in order to intervene as the natural father of
>      [Child]?

With respect to his Motion to Intervene, Father argues

that "[n]o language in HFCR 24, which permits intervention,

requires that a party set aside default before seeking to

intervene."  According to Father, "intervention of right and

permissive intervention are available to 'anyone' who meets" the

requirements of HFCR Rule 24(a) and (b), which do not require

setting aside default.

DHS agrees with Father's arguments and contends that

"[t]he ICA committed grave errors of law or fact when it

affirmed the family's [sic] court['s] decision denying Father's

33

Motion to Intervene without discussing HFCR Rule 24 or applying the right or wrong (de novo) standard of review." DHS also contends "that the family court is empowered to enter further orders it deems to be in the best interest of the children, and such orders may recognize residual interests in the birth parents after the termination of their parental rights." Furthermore, according to DHS,

> Neither the HFCR nor HRS Chapter 587A explicitly states that a party must successfully set aside a default prior to proceeding with a motion to intervene. Regardless, the decision made on either motion will affect the other. If Father's Motion to Set Aside Default is granted then he will regain full party status in the CPA case as the legal father of the child and, by operation of law, the order terminating his parental rights will be reversed. Father would then be given the opportunity to address safety concerns and reunify with [Child] and his interest in custody would be revisited, deeming his Motion to Intervene moot.

> On the other hand, if this Court affirms the family court and ICA's decisions denying Father's Motion to Set Aside the Default, as it should, Father's parental rights will remain terminated. However, Father's statutory interest in visitation with [Child] remains and it can only be reviewed judicially through his Motion to Intervene.

For the following reasons, we agree that Father was not required to set aside the default and default judgment in order to intervene in the CPA proceeding, and that the family court should have analyzed Father's Motion to Intervene under HFCR Rule 24. However, we reject Father's arguments that the ICA erroneously concluded that service by publication did not violate Father's due process rights and that the ICA erroneously

determined that the family court properly denied Father's Motion to Set Aside Default pursuant to HFCR Rules 55(c) and 60(b).

**A.   The ICA did not err when it concluded service by publication was proper and did not violate Father's due process rights.**

On certiorari, Father contends that "[t]he [family] court's failure to follow the requirements for service of process by publication violated HRS § 587A-13(c)(2) and the due process clauses of the Fourteenth Amendment of the United States Constitution and article I section 5 of the Hawaiʻi Constitution, which require proper service of process for a court to have jurisdiction to adjudicate the rights of a party." According to Father, "[b]ecause a parent has a fundamental right to the companionship, care, custody, and management of his or her child, a parent's rights must be protected with fundamentally fair procedures when a permanent termination of parental rights is sought." In addition, Father maintains that "[p]arental rights cannot be denied without an opportunity for them to be heard at a meaningful time and in a meaningful manner." Thus, Father argues that "when termination is sought, due process requires that the parent be provided with adequate notice of the termination hearing and an opportunity to protect his or her interests at the hearing itself."

Here, service by publication did not violate Father's due process rights because DHS did not have, and could not

obtain, the information necessary to personally serve the unknown natural father.  This court has determined that "[r]esort to constructive service by publication is predicated upon necessity, and, if personal service could be effected by the exercise of reasonable diligence, substituted service is unauthorized."  Murphy v. Murphy, 55 Haw. 34, 35, 514 P.2d 865, 867 (1973).  Mother initially reported to DHS that Child's biological father was in Chuuk, but Mother did not provide DHS with identifying information or any way to contact the potential father.  Then, at the December 9, 2016 temporary foster custody hearing, Mother's counsel reported that "[M]other does not know who [Child's] father is."  As the family court found, Mother did not maintain contact with DHS during the CPA proceeding before termination of her parental rights and "did not provide DHS with any further information about the identity or location of [Child's] father[.]"  Thus, DHS did not have reliable information regarding the identity or location of Child's unknown natural father when DHS moved to serve the unknown natural father by publication on March 2, 2017.

As a result, when DHS served Father by publication in April and May of 2017, and when Father was defaulted for his failure to appear after service by publication on June 21, 2017, "DHS remained unaware of any additional information regarding [Child's] father."  Without further information to identify

Child's father and without the ability to consistently contact Mother, DHS was unable to determine the identity of, and personally serve, Child's father with the exercise of reasonable diligence.  See id.  Therefore, service by publication did not violate Father's due process rights because service by publication was necessary given the circumstances of the CPA proceeding.  See id.

**B.    The ICA correctly determined that the family court did not err by declining to set aside Father's default and termination of Father's parental rights by default pursuant to HFCR Rules 55(c) and 60(b).**

On certiorari, Father contends that "since the order for publication of summons is void . . . , the resulting default and default judgment are also void."  According to Father, "HFCR [Rule] 55(c) is not applicable because the default is improper."  However, as discussed above, Father was properly served by publication because DHS did not have, and could not reasonably obtain, the necessary information to identify Child's then-unknown natural father.  Therefore, the ICA correctly determined that Father's default and default judgment were not void due to improper service by publication.

Father also contends that the family court erroneously denied his Motion to Set Aside Default because he satisfied all three requirements to set aside a default.  As the ICA pointed out, when Father filed his Motion to Set Aside Default, "parties

37

seeking to set aside an entry of default pursuant to HRCP Rule 55(c) [had to] satisfy the three-prong test for HRCP Rule 60(b) motions."[17]  Chen, 146 Hawai'i at 174, 457 P.3d at 813.  Under the three-prong test, Father "had the burden of establishing the following to prevail on [his] motion to set aside entry of default: (1) the nondefaulting party will not be prejudiced by the reopening, (2) the defaulting party has a meritorious defense, and (3) the default was not the result of inexcusable neglect or a willful act."  Id.

The ICA properly affirmed the family court's conclusion that Father did not satisfy the requirements to set aside the default and default judgment pursuant to HFCR Rules 55(c) and 60(b).  Notably, the family court determined that Mother's and Father's testimony was not credible, and thus Father could not establish that the failure to file his Motion to Set Aside Default was not the result of inexcusable neglect. This court does not question the family court's determination about Mother's and Father's credibility.  See Fisher, 111 Hawai'i at 46, 137 P.3d at 360.  Thus, for the reasons discussed in the ICA's Memorandum Opinion, the family court properly concluded

---

[17]    This court's holding also applied "to the identical language of Rules 55(c) in the District Court Rules of Civil Procedure as well as the Hawai'i Family Court Rules."  Chen, 146 Hawai'i at 177 n.21, 457 P.3d at 816 n.21.

that Father was not entitled to set aside his default and default judgment pursuant to HFCR Rules 55(c) and 60(b).

**C.    The ICA erroneously concluded that Father was required to set aside the default and default judgment before proceeding with intervention under HFCR Rule 24.**

    **1.    The plain language of HFCR Rule 24(a)(2) demonstrates that Father was not required to set aside the default and default judgment before proceeding with his Motion to Intervene.**

With respect to HFCR Rule 24(a)(2), Father argues that he "is the adjudicated natural father of [Child,]" and that "[h]is purpose in intervening was to protect his interest relating 'to the . . . custody, visitation, or parental rights of [Child,]' and he was 'so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest . . . .'"[18] In addition, Father contends that "[n]otwithstanding the paramount interest in the child, this Court has affirmed that parents have a cognizable and substantial interest in the child, which interest is constitutionally protected."

Based on the plain language of HFCR Rule 24(a)(2), Father was not required to set aside the default and default

---

[18]    In their response to DHS, the Cammacks point out that Father's Motion to Intervene was based not on any residual interest in visitation, but on Father's stated interest in having Child placed in his home. The Cammacks also assert "[Father's] Motion to Intervene did not comply with [HFCR Rule 10]" and "[t]he issue of post-termination visitation was never raised, briefed, or argued during any of the proceedings below." However, despite these arguments, the plain language of HFCR Rule 24 required that Father's Motion to Intervene be analyzed under HFCR Rule 24 before it was denied.

judgment before proceeding with his Motion to Intervene.  HFCR

Rule 24(a)(2) (2015) provides:

> (a) Intervention of Right. Upon timely application
> anyone <u>shall</u> be permitted to intervene in an action:
>
> . . . .
>
> (2) when the applicant claims an interest relating to
> the property, transaction, or custody, visitation, or
> parental rights of a minor child which is the subject of
> the action and the applicant is so situated that the
> disposition of the action may as a practical matter impair
> or impede the applicant's ability to protect that interest,
> unless the applicants [sic] interest is adequately
> represented by existing parties.

(Emphasis added.)  In addition, this court has determined that

> HFCR Rule 24 is generally worded to mandate intervention
> when an applicant meets four elements, namely (1) the
> application to intervene is timely, (2) the applicant
> claims an interest relating to the property, transaction or
> custody or visitation of a minor child which is the subject
> of the action, (3) the applicant is so situated that the
> disposition of the action may as a practical matter impair
> or impede the applicant's ability to protect that interest,
> and (4) the applicant's interest is represented
> inadequately by the existing parties to the suit.

<u>In re Doe</u>, 109 Hawaiʻi 399, 410, 126 P.3d 1086, 1097 (2006), <u>as</u>

<u>corrected</u> (Jan. 27, 2006).

The plain language and elements of HFCR Rule 24(a)(2)

do not require setting aside default and default judgment before

proceeding with consideration of the motion to intervene.  The

use of the word "shall" demonstrates that intervention is

mandatory when HFCR Rule 24(a)(2)'s requirements are satisfied.

<u>See</u> <u>Jack Endo Elec., Inc. v. Lear Siegler, Inc.</u>, 59 Haw. 612,

616, 585 P.2d 1265, 1269 (1978) (citing <u>Nat'l Transit Co. v.</u>

<u>Boardman</u>, 197 A. 239, 241 (Pa. 1938)) ("[T]he word 'shall' [in a

40

statute] is generally regarded as mandatory[.]").  None of these requirements includes setting aside a default and default judgment.  The word "default" is not used anywhere in the text of HFCR Rule 24(a)(2).  In other words, HFCR Rule 24(a)(2) requires family courts to allow any "applicant" who satisfies the requirements to intervene, regardless of whether or not that person was previously defaulted for failure to appear or that person's parental rights were terminated.

In addition, HFCR Rule 24(a)(2) provides only one exception to mandatory intervention.  Under HFCR Rule 24(a)(2), intervention is mandatory if the rule's requirements are satisfied, "unless the applicants [sic] interest is adequately represented by existing parties."  This is the only exception to mandatory intervention, and thus there is no exception if an applicant was previously defaulted for failure to appear or if their parental rights have been terminated.

Because HFCR Rule 24(a)(2)'s language is "plain and unambiguous," effect must be given to its "plain and obvious meaning," which does not require Father to set aside the default and default judgment in order to intervene.  See Choy Foo, 142 Hawaiʻi at 72, 414 P.3d at 124.  Therefore, the ICA erred in affirming the family court's denial of Father's Motion to Intervene without analyzing his motion under HFCR Rule 24(a)(2).

41

2.  **The plain language of HFCR Rule 24(b)(1) did not require Father to set aside the default and default judgment before proceeding with his Motion to Intervene.**

Father argues that "[p]ermissive intervention under HFCR 24(b) was also available because sections of the Child Protective Act . . . confer, in effect, a conditional right to intervene." According to Father, HRS § 587A-33(c) and (d) gives a child's birth family the responsibility to financially support the child and the opportunity to visit the child, even after termination of parental rights. We agree that permissive intervention may be available to Father, and his Motion to Intervene should be analyzed under HFCR Rule 24(b)(1) and HRS § 587A-33(c) and (d).

The plain language of HFCR Rule 24(b)(1) does not require setting aside default and default judgment before proceeding with consideration of the motion to intervene. HFCR Rule 24(b)(1) (2015) provides:

> (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action:
>
> (1) when a statute confers a conditional right to intervene[.]

Thus, the plain language of HFCR Rule 24(b)(1) allows for permissive intervention if a statute provides for a conditional right to intervene. Here, HRS § 587A-33(c) and (d) (Supp. 2014) can be read to confer a statutory right to intervene post-termination of parental rights:

> (c) Unless otherwise ordered by the court or until the child is adopted, <u>the child's family member shall retain, to the extent that the family member possessed the responsibility prior to the termination of parental rights, the continuing responsibility to support the child,</u> including repaying the cost of any and all care, treatment, or any other service provided by the permanent custodian, any subsequent permanent custodian, other authorized agency, or the court for the child's benefit.
>
> (d) <u>A family member may be permitted visitation with the child at the discretion of the permanent custodian.</u> The court may review the exercise of such discretion and may order that a family member be permitted such visitation as is in the best interests of the child.

(Emphasis added.)

In the CPA proceeding, Father testified that he began paying child support for Child in March 2019 and made monthly payments. Father also testified that he visited Child while Child was visiting with maternal aunt, thereby demonstrating Father's interest in visitation with Child. Based on Father's arguments and testimony, HRS § 587A-33(c) and (d) could be read to provide Father with the necessary statutory right to intervene for permissive intervention under HFCR Rule 24(b)(1). Thus, the family court should have determined whether Father's child support payments and interest in visiting Child satisfied the requirements for permissive intervention pursuant to HFCR Rule 24(b)(1) and HRS § 587A-33(c) and (d).

Additionally, neither HFCR Rule 24(b)(1) nor HRS § 587A-33(c) and (d) require setting aside a default and default judgment before proceeding with a motion to intervene. As with HFCR Rule 24(a)(2), the word "default" is not used in HFCR Rule

43

24(b)(1) or HRS § 587A-33(c) and (d).  It follows that the "plain and obvious meaning" allows for permissive intervention without first setting aside default and default judgment.  See Choy Foo, 142 Hawaiʻi at 72, 414 P.3d at 124.  Therefore, the ICA erred in affirming the family court's denial of Father's Motion to Intervene because Father's Motion to Intervene should have been analyzed under HFCR Rule 24(b)(1) to determine whether HRS § 587A-33(c) and (d) allowed for permissive intervention.[19]

3. **Requiring Father to set aside the default and default judgment before proceeding with his Motion to Intervene was unreasonable.**

"[T]his court is bound to construe statutes so as to avoid absurd results."  Amantiad v. Odum, 90 Hawaiʻi 152, 161, 977 P.2d 160, 169 (1999) (citing Keliipuleole v. Wilson, 85 Hawaiʻi 217, 222, 941 P.2d 300, 305 (1997)).  Furthermore, "[a] rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable[,] impracticable . . . inconsisten[t], contradict[ory], and illogical[]."  Id. at 221-

_____

[19]    The ICA determined that Judge Uale had cogent reasons to set aside Judge Park's ruling allowing Father's intervention by stipulation because Father did not set aside his default and default judgment before moving to intervene.  However, because this court concludes that Father was not required to set aside his default and default judgment before moving to intervene, Judge Uale lacked cogent reasons to set aside Judge Park's ruling, which allowed Father's intervention by stipulation.  See Wong v. City and Cty. of Honolulu, 66 Haw. 389, 396, 665 P.2d 157, 162 (1983) ("Unless cogent reasons support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion.").

22, 941 P.2d at 304-05 (original brackets and citation omitted) (brackets added).

Requiring Father to set aside the default and default judgment before proceeding with his Motion to Intervene creates an illogical and unreasonable result. Here, as DHS points out, if Father's Motion to Set Aside Default was granted, Father would regain full-party status in the CPA proceeding because the default judgment terminating his parental rights would be reversed by operation of law. In other words, if Father had succeeded in setting aside the default and default judgment, Father would not have needed to intervene because he would have regained his status as a party. Alternatively, if Father's Motion to Set Aside Default was denied, as was the case here, Father would not have an opportunity for judicial review of his statutorily provided visitation rights under HRS § 587A-33(d) without a motion to intervene. Thus, requiring Father to set aside the default and default judgment before proceeding with his Motion to Intervene would be unreasonable.

## IV.  CONCLUSION

Although Father was properly served by publication and could not establish that he was entitled to relief from the default and default judgment, the plain and unambiguous language of HFCR Rule 24 demonstrates that setting aside a default and default judgment are not required before proceeding with a

45

motion to intervene.  In addition, a reasonable and logical interpretation of HFCR Rule 24 demonstrates that setting aside a default and default judgment are not required because if the default and default judgment were set aside, a motion to intervene would be unnecessary.  Thus, the family court should have analyzed Father's Motion to Intervene under HFCR Rule 24.

Accordingly, we affirm in part and vacate in part the ICA's October 27, 2020 Judgment on Appeal, which affirmed the family court's September 20, 2019 "Decision and Order Regarding the Contested Case Hearing on [Father]'s Motion to Set Aside Default Filed June 5, 2019" denying Father's Motion to Set Aside Default and his Motion to Intervene without analyzing the Motion to Intervene under HFCR Rule 24.  We remand the case for further proceedings consistent with this opinion.

Georgia K. McMillen
for Petitioner/Father-Appellant

Maria F. Casavilla,
Julio C. Herrera,
Erin K.S. Torres, and
Patrick A. Pascual
for Respondent-Appellee
Department of Human Services

Francis T. O'Brien
for Respondents/Intervenors-
Appellees Resource Caregivers

Shelby N. Ferrer
for Respondent Court Appointed
Special Advocates Program

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

